Curtis L. PARKER and Martha Parker

v.

UNITED STATES of America.

Civ. A. No. 10358.

United States District Court
W. D. Louisiana,
Shreveport Division.

June 14, 1965.

J. Philip Goode, Shreveport, La., for plaintiffs.

Edward L. Shaheen, U. S. Atty., and Edward V. Boagni, Asst. U. S. Atty., Shreveport, La., Edward A. Copley, Atty., Tax Division, Dept. of Justice, Fort Worth, Tex., for the Government.

BEN C. DAWKINS, Jr., Chief Judge.

Plaintiffs here seek a refund of income taxes which were assessed by the Government for the calendar years 1959, 1960 and 1961. Plaintiffs paid the taxes under protest and now seek refund in the amount of $1,697.13. Jurisdiction is vested by 28 U.S.C.A. § 1346(a). The matter is before the Court upon cross-motions for summary judgment.

April 1, 1959, Curtis L. Parker and B. K. Eaves formed a Louisiana corporation with authorized capital stock consisting of one thousand shares. Parker subscribed to eighty per cent of the stock and paid for it by transferring certain property to the corporation, and stock certificates for 800 shares were issued to him. Eaves subscribed to twenty per cent of the capital stock and agreed to pay $23,350.00 for it. He paid $7,500.00 in cash and agreed to pay the balance in six installments over a period of five years. He did not give the corporation a note for the balance, but his debt was carried on the corporate books as a note receivable, and he subsequently paid for his stock in full, the last payment being made June 1, 1964.

At the first meeting of the corporation's board of directors a resolution was passed accepting Eaves' subscription. He was issued stock certificates for the amount of stock paid up at that time, or 64.239 shares; and a resolution was passed that the remainder of his stock certificates would be issued as the purchase price was paid.

Eaves and Parker collaterally entered into a stock transfer agreement providing that should Eaves resign, be discharged or otherwise cease to be employed permanently by the corporation, he would sell all of his stock in the corporation to Parker. Parker agreed to purchase Eaves' stock in this event at an agreed price of $116.75 per share until April 1, 1960. Thereafter the price would be as agreed upon by the parties. If they could not agree upon a price, a procedure for fixing the price of the stock was set forth. This procedure would set the price of the stock at its fair market value. On the face of each stock certificate issued to Eaves was printed a stipulation that the certificate was subject to this buy-and-sell agreement and that the stock was non-transferable except in accordance with the agreement.

Parker sold certain depreciable property to the corporation in exchange for the obligation of the corporation to pay for the property in installments over a ten year period. Plaintiffs elected to treat the sale as an installment sale and reported it as a long-term capital gain on a capital asset held more than six months under Section 1231 of the Inter-

nal Revenue Code. The Internal Revenue Service nevertheless treated the profit from the sale as ordinary income under Internal Revenue Code Section 1239, based upon the contention that taxpayers owned more than eighty per cent "in value" of all outstanding stock of the corporation at the time of the sale.

Section 1239 (26 U.S.C.A. § 1239) provides:

"(a) *Treatment of gain as ordinary income.*—In the case of a sale or exchange, directly or indirectly, of property described in subsection (b)—

(1) between a husband and wife; or

(2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren;

any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231.

"(b) *Section applicable only to sales or exchanges of depreciable property.*—This section shall apply only in the case of a sale or exchange by a transferor of property which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 167. Aug. 16, 1954, 9:45 a. m., E.D.T., c. 736, 68A Stat. 332.

"\* \* \*"

Plaintiffs contend that Parker did not own "more than 80 percent in value of the outstanding stock" at the time of the sale, since Eaves owned the entire 200 shares allotted to him, even though he had not paid for all such shares, and stock certificates for only 64.239 shares had

been issued to him. Defendant contends that only the shares for which stock certificates had been issued constituted "outstanding stock" and that of the 864.239 shares actually issued, plaintiffs owned 800 shares, well over 80 per cent of the stock. Defendant further contends that even if it be held that all the allotted shares constitute "outstanding stock," the 200 shares subscribed by Eaves were of less value per share than those owned by Parker. Thus, defendant contends that Parker owned "more than 80 percent *in value* of the outstanding stock." (Emphasis added.)

The principal issue, therefore, is whether the 135.761 shares subscribed by Eaves and allotted to him by the corporation constitute "outstanding stock" even though he had not yet paid for all of these shares, and no stock certificates had been issued to him for them.

The only case which has been found by our research and that of counsel dealing with the question of what constitutes "outstanding stock" within the meaning of Section 1239 is Trotz v. Commissioner, 43 T.C. 127 (1964), cited and relied on by defendant. In that case a corporation was formed with Trotz and his wife being issued 79 per cent of the shares, and one Kelly was issued 21 per cent of the stock. Trotz sold depreciable property to the corporation to be paid for in installments, the profit on which was reported as a long-term capital gain. The Tax Court held that under Section 1239 the gain from the sale should be treated as ordinary income, since the taxpayer's rights with respect to the stock issued to Kelly were "so complete" that they were "tantamount to ownership" for purposes of Section 1239.

We find several factors which clearly distinguish Trotz from the present case. Trotz actually loaned Kelly the money required for the purchase of his stock, evidenced by a promissory note. Kelly pledged his stock and assigned any bonuses and dividends he might receive to Trotz, delivering the stock certificates to Trotz pursuant to the pledge agreement.

Trotz and Kelly entered an "Option to Purchase Stock" whereby Kelly gave Trotz the option to purchase his stock at book value, with no value assigned to intangibles, if he died or ceased to be an officer of the corporation. The by-laws of the corporation authorized the majority stockholder to remove any officer or director at any time with or without cause.

Moreover, Kelly worked for the corporation only nine months after its inception, following which he submitted his resignation. Trotz then cancelled and returned the note and acknowledged receipt of the shares of stock. At that time Kelly had made no payments on the note. The Tax Court held that the control of the stock by Trotz was more secure than if it had been owned by his family.

The facts of the case before us indicate considerably more of an arm's-length transaction between Parker and Eaves. Parker did not loan Eaves any money with which to purchase his shares of stock, and Eaves did not pledge any shares to Parker. Eaves has continued to work for the corporation until the present time, and he has paid the corporation in full for all of his shares. Although Parker and Eaves did enter a stock transfer agreement somewhat similar to that which subsisted between Trotz and Kelly, it was based on the contingency that Eaves should die or cease to be employed permanently, while the agreement in Trotz was based upon the contingency that Kelly should die or cease to be an officer or director. We further note that the Parker-Eaves agreement contained a more equitable formula for determining a fair market value for the shares to be transferred upon the happening of either of these contingencies.

It is true that Parker, as majority stockholder, had the power under Article VIII (I) of the corporation's articles of incorporation to remove a director at any time. But this action by Parker would not activate the stock transfer agreement between him and Eaves, so long as Eaves continued to be employed by the corporation in any other capacity.

The court in Trotz found that he was in a position to, and did in fact, exercise complete and absolute control over the stock issued in Kelly's name. There is no such control by Parker indicated here, especially since there was no loan by Parker to Eaves and no pledge of the stock to Parker. Parker had no rights to the stock allotted to Eaves that could be considered "tantamount to ownership." Therefore, we find that Trotz is not controlling, or even persuasive, here.

As mentioned, at the first meeting of the corporation's board of directors Eaves' subscription was accepted, and authority was given to issue the remainder of the shares to him as he paid for them. This action constituted an allotment of the 200 shares to Eaves.* LSA–R.S. 12:1(A) (1950) provides:

"A. 'Allotment' means the apportioning of a certain number of shares to a subscriber or incorporator in response to the application contained in his subscription * * * or to a purchaser. * * *"

LSA–R.S. 12:1(N) (1950) provides that "[a] subscriber becomes a shareholder *upon the allotment of shares to him.*" (Emphasis added.) However, stock certificates may not be issued to a shareholder until the purchase price of the shares is fully paid. In 2 La.Law Review 597, 616, the author of a Comment entitled "The Louisiana Business Corporation Act of 1928" states:

"Section 16, subsection I [LSA–R.S. 12:16(A) (1950)], following an express mandate of the Louisiana Constitution, prohibits *the issuance*

---

* This is true even though the corporation submitted a report April 1, 1959, to the Secretary of State under LSA–R.S. 12:18 which stated that 864.239 of the authorized shares had been allotted. An amended report was submitted by the corporation October 23, 1962, showing that all of the 1000 shares were allotted on April 1, 1959.

of a certificate of stock 'until the shares represented thereby have been fully paid for.' * * * This restriction is necessitated by the negotiable qualities of the certificate. *It does not prevent a subscriber from immediately becoming a shareholder upon the allotment of his shares,* but does prohibit the issuance of a certificate to him until the shares are fully paid for. Subsection II [LSA–R.S. 12:16(B) (1950)] eliminates any possible uncertainties as to the effect of payment by promissory note or check. * * *" (Emphasis added.)

■ Thus, when Eaves was *allotted* the stock by the board of directors, he became a shareholder of the entire 200 shares, although certificates for the shares would not be issued until he had paid for them in full. Such acceptance of Eaves' subscription for 200 shares and the allotment of these shares to him constituted a sale of the shares to Eaves and made him their owner. This is shown by LSA–R.S. 12:22 (1950) which provides:

"If a shareholder be indebted to the corporation on account of unpaid subscriptions for shares, the corporation shall have a vendor's privilege upon such shares to the extent of this indebtedness."

It is axiomatic under Louisiana law that a vendor's privilege attaches only to a sale transaction. See LSA–Civil Code Arts. 3227, 3249 (1950). The corporation here possessed the right to bring suit against Eaves for the unpaid portion of the purchase price, and to obtain a personal judgment against him. If the value of his shares had declined, so that the vendor's privilege would not be satisfied in full, Eaves would have been subject to a deficiency judgment for the balance.

■ Therefore, we conclude that Eaves was a shareholder and owner of 200 shares of stock in the corporation at the time of the transaction in question and that all of such shares constituted "outstanding stock" within the meaning

of Section 1239. When the 135.761 shares for which full payment had not been received were allotted to Eaves, they became "outstanding stock." In reaching this conclusion we again emphasize, as stated above, that the transaction between Parker, Eaves and the corporation obviously was an arm's-length transaction and that Parker never had such control over the shares allotted to Eaves as to be tantamount to ownership. Cf. Trotz v. Commissioner, supra.

Further support for this conclusion is found in the fact that 26 U.S.C.A. § 4301 imposes a tax on the original issue of shares or certificates of stock issued by a corporation. Federal Tax Regulation 43.-4301–1(a) sets forth the scope of this tax:

"Section 4301 imposes a tax on each original issue of shares or certificates of stock issued by a domestic corporation. * * * *Stock is deemed to be issued when it is subscribed for and the subscription is accepted.* * * *" (Emphasis added.)

We think a similar rule should apply under Section 1239. The acceptance of a subscription constitutes an allotment of shares under Louisiana law, and under the Federal Tax Regulations it constitutes an issuance of the shares. If such shares are to be considered issued at that time, we think it follows that they then become "outstanding stock."

As noted, defendant also contends that Parker's stock constituted more than 80 per cent *"in value"* of the corporation's outstanding stock. It is contended that Eaves' shares were not as valuable as Parker's shares because unissued shares cannot be voted under LSA–R.S. 12:32 (G) (1950); because Eaves' shares are subject to the stock transfer agreement between Eaves and Parker; and because Eaves could not transfer *his* unissued shares even in the absence of this agreement, since title to shares of stock may be transferred only by delivery of the certificate (LSA–R.S. 12:524 (1950)).

We do not think these limitations on the transferability and voting rights of Eaves' stock caused it to have less value

than Parker's stock. The value of the stock allotted to Eaves was set by the board of directors at $116.75 per share. Parker received 800 shares and transferred to the corporation property valued at $93,400, which amounted to $116.75 per share. The sale of depreciable property by Parker to the corporation was approved at the first meeting of the board of directors, and there had been no time for the market value of the shares to decline.

■■ Moreover, for the purposes of determining whether a stockholder owns more than 80 per cent "in value" of the outstanding stock under Section 1239, we think the shares should be evaluated by determining the amount of paid-in capital each share represents. The fact that a stockholder cannot be issued shares until they are paid for in full and cannot vote unissued shares does not diminish this value, because these rights could be obtained merely upon the shareholder's completing the payments for the shares. Nor does the fact that the shareholder voluntarily agrees to limit his right to transfer his shares of stock affect their value, for under an arrangement such as was here entered into, he would obtain true value upon selling them to Parker. Having already paid $7500 in cash for the 200 shares allotted to him, we have no doubt whatever that Eaves easily could have borrowed from a bank the remaining $15,850 to pay the balance of the agreed subscription price, subject of course to Parker's pre-emptive rights under the agreement.

We thus conclude that for the purposes of Section 1239 the shares issued to Parker and those issued or allotted to Eaves had the same value per share. Consequently, at the time Parker sold the depreciable property to the corporation, he did not own more than 80 per cent in value of the outstanding stock.

For these reasons plaintiffs' motion for summary judgment is granted and defendant's motion for summary judgment is denied. A proper decree should be presented.