Harry **TROTZ** and Camille Trotz,
Petitioners,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

No. 8161.

United States Court of Appeals
Tenth Circuit.

June 10, 1966.

Seth, Circuit Judge, dissented.

Leland B. Franks, Albuquerque, N. M., for petitioners.

William A. Friedlander, Attorney, Department of Justice (Richard M. Roberts, Acting Asst. Atty. Gen., and Meyer Rothwacks, Harry Baum, Lee A. Jackson, and David O. Walter, Attorneys, Department of Justice, on the brief), for respondent.

Eugene J. Brenner, San Francisco, Cal. (Janin, Morgan, Brenner & Freeman, San Francisco, Cal., on the brief), amicus curiae.

Before MURRAH, Chief Judge, and BREITENSTEIN and SETH, Circuit Judges.

BREITENSTEIN, Circuit Judge.

Petitioners, husband and wife, seek review of a Tax Court decision [1] affirming the Commissioner's assessment of an income tax deficiency for the tax years 1958 and 1959. The issue is whether a gain on an instalment sale of depreciable property by taxpayer to Trotz Construction, Inc., is taxable as a long-term capital gain. Section 1239 of the Internal Revenue Code of 1954 [2] provides that gain on the sale of depreciable property by an individual to a corporation "more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren" is to be treated as ordinary income rather than capital gain.

Trotz Construction, Inc., was incorporated under New Mexico law in February, 1958. The charter authorized 400 shares of common stock with a par value of $100 per share. The corporation issued 316 shares, or 79% of the authorized stock, to the taxpayer and his wife. The remaining 84 shares, or 21% of the authorized stock, were issued to Ben F. Kelly, Jr., who was not related to the taxpayer by blood or marriage. All of the $40,000 capital of the corporation was paid by taxpayer in cash.

Taxpayer was named president of the new company. His wife was secretary-treasurer, and Kelly was vice-president. The three of them made up the board of directors. The minutes of the first meeting of the stockholders and directors fixed the amount of salary and bonus of net profits to which each would be entitled.

Kelly owed taxpayer $8,400 for the stock issued to him and executed a promissory note payable to taxpayer in this amount. The note was secured by a pledge of the stock which provided that all bonuses accruing to Kelly were to be paid to the taxpayer and applied on the indebtedness. Dividends were also payable to taxpayer but without application on the debt. Kelly also executed an agreement giving taxpayer an option to purchase his stock in the corporation at book value, excluding good will and other intangibles, in the event Kelly should die or cease to be an officer or director of the company. The corporate by-laws provided that an officer or director could be removed, with or without cause, by a vote of the majority of the stockholders.

Kelly's employment with the company began in March, 1958, and ended in December of that year when he voluntarily resigned as an officer and director because of a disagreement between him and the taxpayer. Kelly then surrendered his company stock to the taxpayer who cancelled the $8,400 note. Kelly made no payments of either principal or interest on the note.

Immediately following the organization of the company taxpayer sold sub-

---

1. The findings of fact and opinion of the Tax Court are reported at 43 T.C. 127.

2. 26 U.S.C. § 1239.

stantially all of his construction equipment to the company for $183,153.33 which was the median market value as determined by three independent appraisers. The long-term gain on the sale was reported on the instalment basis in the taxpayer's income tax returns for the years 1958 and 1959.

The Tax Court did not find that the transaction between the taxpayer and Kelly was a sham. The record indicates that it was made in good faith, that Kelly was intended to have rights, and that it was voluntarily terminated by Kelly. The problem is whether taxpayer at the pertinent time owned "more than 80 percent in value of the outstanding stock" of the company. If he did, § 1239 requires that the profit is taxable as ordinary income rather than as a capital gain.

■ The Tax Court held that the taxpayer's "rights with respect to the stock issued to Kelly were so complete that they were tantamount to ownership by petitioner for the purposes of section 1239." One judge dissented pointing out that § 1239 uses the word "owned" and that it does not mean "in effect," "tantamount to," or "in substance." We agree with the dissenting judge.

Taxpayer owned less than 80% of the stock unless the ownership of Kelly's shares is attributed to him. His rights to the Kelly stock were contract rights and were dependent on an option to purchase in the event Kelly died or ceased to be an officer and director. The Commissioner concedes that optioned stock is owned by the optioner but insists that the totality of the circumstances sustains the Tax Court decision. The argument would be impressive if the record showed sham or lack of good faith—but it does not.

■ On the authority of the Fourth Circuit decision in Mitchell v. Commissioner of Internal Revenue, 4 Cir., 300 F.2d 533, we held in United States v. Rothenberg, 10 Cir., 350 F.2d 319, that the term "owned" as used in § 1239 did not include property beneficially owned. Although those decisions rested upon the question of attribution of ownership because of family relationship, they are pertinent in their rejection of the Commissioner's contention that a qualified ownership suffices to require the application of the statute.

■ The argument of the Commissioner equates ownership with control and urges that, because taxpayer controlled the stock, he owned it. Parenthetically, we observe that here control of the corporation is unimportant because taxpayer and his wife owned 79% of the stock and did not need Kelly's stock to dominate corporate activities. We believe that if Congress had intended control to be the criterion rather than ownership it would have said so.

Section 1239 is a carry-over in the 1954 Code of § 117(o) of the 1939 Code, and was enacted as a part of the Revenue Act of 1951. As pointed out in Mitchell[3] the original version as passed in the House of Representatives denied capital gains treatment on a sale to a corporation of which 50% of the value of the stock was "owned, directly or indirectly by or for" the seller.[4] The Senate eliminated this provision.[5] After the report of a Conference Committee, the present language was adopted.[6]

To us the elimination of constructive ownership is significant. Attribution of ownership occurs only in situations of family relationship. We find nothing in the legislative history which shows a congressional intent to use the word "owned" as embracing a concept other than legal title. As pointed out in Mitchell,[7] "the Internal Revenue Code is specific whenever tax consequences depend upon the equitable ownership of stock, as contrasted to its legal ownership."

3. 300 F.2d 533–537.

4. 2 U.S. Congressional and Administrative Service '51, p. 1909.

5. Id. pp. 2041–2042.

6. Id. p. 2135.

7. 300 F.2d 533, 536.

In the case at bar the taxpayer did not have the legal title. All he had was a contract right to acquire that title. The fact that such contract right brought the legal title to him is immaterial because the operation of the contract resulted from the voluntary act of Kelly, the legal owner of the stock. The Tax Court held that the contract rights were "tantamount to ownership." In our opinion tantamount ownership is not sufficient to satisfy the statute. Stock which a taxpayer has only a contract right to acquire is not owned by him.

The Commissioner presents as an alternative position the argument that even if the taxpayer is not considered as the owner of all the outstanding stock, the stock held by him represents more than 80% in value of the outstanding stock. Although this point was argued to it, the Tax Court did not resolve the issue because of its decision on the ownership question. The phrase "in value" as used in § 1239 must have an intended meaning. If the 80% determination is to be on the basis of the number of shares outstanding, no reason exists for the use of the words "in value."

The contention of the taxpayer and the amicus is that a value test may be applied only where more than one class of stock is outstanding. The answer is that the statute makes no such distinction but applies the value test without qualification to the outstanding stock of the corporation in question. The amicus says that the value test is impracticable but points to no reason why it may not be practically applied in the case at bar. The argument that a value test is not used in other provisions of the Internal Revenue Code is irrelevant. We are not going to write the words "in value" out of § 1239.

We make no comment on the claim that the taxpayer in fact owned more than 80% in value of the outstanding stock. This presents a factual issue for determination in the first instance by the Tax Court. All we hold is that a numerical count of outstanding shares, in and of itself, does not determine the percentage of value.

The decision of the Tax Court is reversed and the case is remanded for a factual determination as to whether the taxpayer's shares were 80% or more in value of all outstanding shares.

SETH, Circuit Judge (dissenting).

I respectfully dissent from the opinion of the majority of the court.

The record shows that the eighty-four shares of the corporation stock in question were originally issued in the name of Ben F. Kelly, Jr., and when the entire transaction is examined, that is about all that can be said about his interest in the company. The certificates on issuance were endorsed by Kelly to Trotz and were delivered to the possession of Trotz where they remained at all material times thereafter, and Trotz had the right to receive the dividends on the shares. Trotz provided all of the cash to the corporation for the issuance of the shares, including the $8,400.00 for the eighty-four shares in question. As between Trotz and Kelly this amount was treated as a loan to Kelly, who gave back a promissory note. There was however no personal liability on this note (the stock could be surrendered as payment), and the record does not indicate that any payments were made on it.

However the most significant feature of the arrangement was the fact that upon its completion, Kelly had no right to regain possession of the shares of stock as against the wishes of Trotz. The corporate bylaws made express provision for the removal of an officer or director by a majority vote (which Trotz had), and in the event Kelly was so removed Trotz had the right to have the shares reissued in his name. This could be done by giving credit on the note or by payment of the book value of the stock, not including intangibles, as determined by the board of directors. Thus as far as Trotz was concerned, he was in a position to always retain possession of the shares of stock as against the wishes of Kelly. It would seem that the concep-

tion of ownership would include the enforceability, practically and legally, of rights as to the property in question. If the transaction is so examined, it is clear that all of the effective rights were retained by Trotz.

Thus when the arrangement is examined on the before and after basis, it is apparent that Trotz gave up nothing by way of ownership in his contracting business through the incorporation and the arrangement with Kelly.

The purpose of the Act under consideration is to prevent the transfer of assets of the nature of those in question from an individual to a corporation controlled by such individual and vice versa, and thus to prevent the transfer of depreciated assets from one pocket to the other to secure tax advantages under the capital gains rates and the new base for depreciation. "Control" for the purpose of this section of the Code would appear to have been defined by Congress as the ownership of more than eighty per cent in value of the shares of the corporation, and is not corporate control in the usual sense. Congress has presumed that the taxpayer has control of shares which may be wholly owned by his spouse, by his minor children, or by his minor grandchildren. Congress has not expressed any other presumed control, and thus we are left with the question as to whether or not Congress intended by the use of the word "owned" to include control by the taxpayer over shares which are issued in the names of other persons. It would appear that the matter must be so examined in the light of "control" over the corporation or over the shares. This guide for construction should be utilized although it has been pointed out by the parties that the House version of the legislation which referred to direct or indirect ownership was eliminated from the Bill as it was finally adopted.

Reference is made to two cases relating to trusts. These are, of course, Mitchell v. Com'r of Internal Revenue, 300 F.2d 533 (4th Cir.), and our case of United States v. Rothenberg, 350 F.2d 319 (10th Cir.). The Mitchell decision is based entirely on the fact that the legislative history of Section 1239 of the 1954 Internal Revenue Code demonstrates the intention of Congress that the interest of beneficiaries of trusts not be included. The decision also mentions control over other stock and notes, the specific limitations contained in the present Act, as compared to the more general language of indirect ownership contained in the House version of the Bill. Thus the Mitchell case and our Rothenberg case, which was based upon the Mitchell case, did not decide that beneficial interests were not included by reason of the nature of such interests. Instead the decision was based entirely upon the legislative history that such interests be not included regardless of their legal character. Thus the two cited cases, in my opinion, do not help us in reaching our decision in the present case. We are thus left with the language and the purpose of the Act.

As indicated above reliance cannot be placed upon any particular document, but instead the entire series of events must be considered. If a particular event or document is examined separately, certain assumptions as to the legal relationship of the parties or assumptions as to the property must be made which may not be warranted. For example, if the rights of the parties are considered to depend upon the option agreement, a part or all of the result is thereby assumed, although to give an option Kelly must be considered to be the "owner" of the shares.

Likewise the substance of the arrangement must be considered rather than placing reliance upon its form. We do not have a question of attributing ownership as the term is ordinarily used nor do we have the case where the bare contract rights of the parties will determine the transaction.

In my opinion when the substance of the transaction is examined, the case falls within the intention of Congress that the transfer of depreciated assets be not permitted from one pocket to the other. For the purpose of the statute, Trotz "owned" the shares in question and Kelly had no "ownership" in them. This

ownership is just as effective or more effective than the presumed control which Congress has found to exist, for example, in circumstances where the stock is owned by the grandchildren of the taxpayer, and comes within the meaning of the statute.

I would affirm the decision of the Tax Court.