Harry Trotz and Camille Trotz v. Commissioner.
Trotz v. Commissioner
Docket No. 562-62.
United States Tax Court
T.C. Memo 1967-139; 1967 Tax Ct. Memo LEXIS 119; 26 T.C.M. (CCH) 632; T.C.M. (RIA) 67139; June 27, 1967
Leland B. Franks, Simms Bldg., Albuquerque, N. Mex., for the petitioners. Edward H. Boyle, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: This case is presently before the Court on remand from the United States Court of Appeals for the Tenth Circuit 361 F. 2d 927). TThe only issue [1] is whether the shares owned by petitioners in Trotz Construction, Inc., were 80 percent or more in value of all outstanding shares in said corporation for purposes of section 1239 of the Internal Revenue Code of 1954. *120 On the facts presented respondent argued that petitioners owned more than 80 percent in value of the outstanding stock of Trotz Construction, Inc., because (1) in substance petitioners owned 100 percent of the stock even though in form they owned only 79 percent; and (2) even though petitioners owned only 79 percent of the numerical number of shares, that interest represented more than 80 percent in value of the outstanding stock of Trotz Construction, Inc. We held for respondent on his first theory and did not consider his second theory. On appeal the Tenth Circuit reversed our decision based upon respondent's first theory and remanded the case "for a factual determination as to whether the taxpayer's shares were 80% or more in value of all outstanding shres." Harry Trotz v. Commissioner, 361 F. 2d 927 (C.A. 10, 1966), reversing and remanding 43 T.C. 127 (1964). Findings of Fact Harry Trotz (hereinafter referred to as Trotz) and Camille Trotz filed their Federal joint income tax returns for the taxable years 1958 and 1959 with the district director of internal revenue, Albuquerque, New Mexico. Prior to February 1958 Trotz was the owner of Trotz *121 Construction Company, a sole proprietorship engaged in road construction in New Mexico. On February 3, 1958, petitioners and Ben F. Kelly, Jr. (hereinafter referred to as Kelly)caused Trotz Construction, Inc. (hereinafter referred to as Construction, Inc.) to be incorporated under New Mexico law. Construction, Inc., was a comparatively smallsized construction firm. Trotz had no contractual obligation to continue his connection with Construction, Inc. Pursuant to the corporate charter, 400 shares of authorized common stock, each having a par value of $100 per share, were issued on March 1, 1958, as follows: Name
Shares
Percentage
Harry Trotz
216
54
Camille Trotz
100
25
Ben F. Kelly, Jr.
84
21
Total
400
100
Also on March 1, 1958, the above-said persons adopted the bylaws of the corporation which contained the usual clauses with respect to the conduct of the corporate business. Article IV, section (7), of these bylaws provided: "Any Director or Officer may be removed from his office or position at any time with or without cause by the affirmative vote of a majority of the stockholders of the corporation." Trotz turned over to Construction, Inc., $40,000 *122 cash for the 400 shares of stock being issued. He purportedly loaned Kelly the $8,400 required for Kelly's purchase of 84 shares of stock of the newly-formed corporation. The loan was evidenced by a promissory note. In order to secure the payment of the purported indebtedness, Kelly pledged his stock and assigned any bonus and dividend he might receive from Construction, Inc., to Trotz by a document entitled "PLEDGE OF STOCK AND COLLATERAL AGREEMENT." Kelly delivered the endorsed certificate evidencing his 84 shares of stock to Trotz, pursuant to the Pledge of Stock and Collateral Agreement. Trotz retained the Kelly certificate from that time. As a further part of the same transaction Kelly, Trotz, and Trotz's wife executed on March 1, 1958, a document entitled "OPTION TO PURCHASE STOCK." The document provides, in part, as follows: 1. First party [Kelly] does hereby agree that in the event he shall for any reason cease to be an officer and/or director of [Construction, Inc.] or shall die, second parties [petitioners], or either of them, their respective heirs, executors, administrators and assigns, shall have and are hereby given an option to purchase the stock now held by *123 first party and any further shares of [Construction, Inc.] which first party shall hold or acquire by any increase in the capital stock of the company, or otherwise, at the book value of said stock as determined by the Board of Directors of said company. In computing such book value, it is understood and agreed that no value shall be estimated for the good will, trade names, trade marks or other intangible assets. 2. It is understood and agreed that if second parties, or either of them, their respective heirs, administrators or assigns, shall not exercise within thirty (30) days after written demand from first party, their option to purchase said stock, at the book value of said stock, in cash, then first party shall have the right to sell or transfer his shares of stock to any other party, free from any of the obligations of this Agreement. 3. First party agrees that he will make no sale, transfer or pledge of said stock except subject to the option and rights herein given to second parties. THIS OPTION AGREEMENT Shall be binding upon the parties hereto and upon their respective heirs, executors and assigns. Immediately following the incorporation on March 1, 1958, petitioner *124 sold substantially all of his construction equipment to Construction, Inc., for $183,153.33, which was the median market value as determined by three independent appraisers. As payment for the equipment Construction, Inc., assumed $22,933.55 of purchase money indebtedness against the equipment, paid $35,219.78 in cash, and issued to Trotz a $125,000 promissory note secured by a chattel mortgage on the equipment sold. The bill of sale that effected the transfer listed each item of equipment and the price the purchaser paid for each item. In each instance the purchase price was in excess of Trotz's January 1, 1958, basis, with the single exception of one 12-ton Galion tandem roller. In that case the purchase price was less than the January 1, 1958, basis. Kelly's employment with Construction, Inc., commenced in March 1958 and lasted until the latter part of December 1958, at which time disagreement arose between Trotz and Kelly. Kelly, on his own volition, submitted his resignation as vice president and director of Construction, Inc., effective December 29, 1958. On January 15, 1959, Trotz wrote Kelly acknowledging receipt of the certificate for 84 shares of stock, canceling the $8,400 *125 note, and indicating return of the note to Kelly. At the time of the surrender Kelly had made no payments on the note. In New Mexico the State Highway Department, the Bureau of Public Roads or some other Government agency are the primary parties who contract for the services of road construction contractors. Governmental road construction contracts are awarded on the basis of competitive bidding to the lowest responsible bidder. There are very few private road contracts in New Mexico. Consequently, road construction contracts in New Mexico are almost always awarded on the basis of competitive bidding. Moreover, there is no competitive advantage between contractors bidding on a road construction job in New Mexico. Road contractors in New Mexico do not advertise in order to create a public image. Construction, Inc., like other small and medium-sized Construction, Inc., like other small- and medium-sized road construction firms in New Mexico, lacked transferable goodwill. The goodwill of Construction, Inc., was personal to Trotz. No market existed for the stock of small-or medium-sized construction construction companies located in New Mexico, at least as going concerns. The value *126 of stock in such corporations was equivalent to the value of the underlying assets - generally, the construction equipment. When contractors left the business or retired, they generally sold their equipment at auction or else the equipment was passed on to their children. Opinion The issue for decision is whether a gain on an installment sale of depreciable property by Trotz to Construction, Inc., is taxable as a long-term capital gain. Section 1239(a)(2) provides: (a) * * * In the case of a sale * * * of property * * *
(2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, * * * any gain * * * shall be considered as gain * * * which is neither a capital asset nor property described in section 1231. In our original decision herein we held that Trotz's "rights with respect to the stock issued to Kelly were so complete that they were tantamount to ownership by petitioner [Trotz] for purposes of section 1239." The Court of Appeals for the Tenth Circuit reversed our decision on this *127 issue on the grounds that "tantamount ownership is not sufficient to satisfy the statute" and, accordingly, Trotz did not "own" Kelly's shares for the purposes of section 1239. In the original proceeding the respondent presented as an alternative position the argument that even if Trotz is not considered as the owner of all the outstanding stock of Construction, Inc., the stock held by him represents more than 80 percent in value of the outstanding stock. We did not resolve this contention because of our decision on the "ownership" question. The Tenth Circuit specifically made no comment on respondent's claim that Trotz in fact owned more than 80 percent in value of the outstanding stock. However, the case was remanded for a factual determination as to whether Trotz's shares were 80 percent or more in value of all outstanding stock. The Tenth Circuit stated that a "numerical count of outstanding shares, in and of itself, does not determine the percentage of value" for purposes of section 1239. Thus, under the terms of the remand, we must determine whether the value of petitioners' shares *128 exceeded 80 percent of the value of the total outstanding stock of Construction, Inc. Respondent contends that the total dollar value of the outstanding stock of Construction, Inc., on March 1, 1958, was $42,000 as opposed to the book value of the stock on the same date which was $40,000. Respondent bases his contention on the testimony of Robert C. Smith, respondent's expert witness. [2] Smith testified that he believed the value of the outstanding stock of Construction, Inc., was in excess of book value (1) because Construction, Inc., was a going business as of March 1, 1958, and (2) because of the "goodwill" factor attributable to Trotz's past record in the road contracting business. Respondent also maintains that petitioners' 79 percent stock interest in Construction, Inc., had a dollar value of $38,000, or 90 percent of the total value ($42,000) that he ascribed to the corporation's outstanding stock. Once again, respondent's position is based upon the opinion of his expert witness. The two basic reasons for Smith's, and respondent's, belief that petitioners' 79 percent stock interest was worth 90 percent of the fair market value of all Construction, Inc.'s outstanding stock *129 are (1) the factor of petitioners' control over Construction, Inc., by reason of their ownership of 79 percent of its stock, and (2) the existence of Trotz's option to purchase Kelly's stock. (Respondent adds that if the total dollar value of the outstanding stock of Construction, Inc., was $40,000, then petitioners' 79 percent stock interest had a value of $36,000, or 90 percent of the aforesaid total stock value.) In substance respondent has based his entire argument upon the testimony of his expert witness. Although Smith testified that he considered the factor of control to be a primary consideration in reaching his estimate as to the value of petitioners' stock in Construction, Inc., he admitted that he had no occasion to evaluate, or any experience in evaluating, the dollar value of the control factor in relation to road construction firms. Moreover, he *130 testified on cross-examination that he had no experience whatsoever in creating a market for or dealing in the stock of small road construction firms. Smith based his opinion in the instant case upon his observation that premiums are paid for control of companies in cases where a public market for the stock does exist. Smith also admitted that he realized no market existed for Construction, Inc., stock. Smith's conclusion that the factor of control enhances the value of stock in Construction, Inc., even though he admitted that no market for the stock in Construction, Inc., exists, places his expertise in this area in irremediable doubt. The testimony of petitioners' expert witnesses was not contradicted in any respect but was, in fact, corroborated by the testimony of respondent's expert witness. Petitioners' expert witnesses, James H. Ryan [3] and John W. Jones, [4] confirmed Smith's admission that no market existed for stock in Construction, Inc., or in like companies. Although they lack experience in marketing stock, they are familiar with the market for small- and medium-sized road construction companies in New Mexico. It is clear to us from their testimony that in general (1) *131 small- or medium-sized construction companies located in New Mexico have no "going concern" value and (2) the value of any stock in such corporations is equivalent to the value of their underlying assets, i.e., the equipment used in road construction. Construction, Inc., lacked any transferable goodwill. Any goodwill associated with Construction, Inc., as of March 1, 1958, was personal to Trotz himself. On crossexamination Smith admitted that if Trotz severed his connection with Construction, Inc., he would not attribute *132 any goodwill to the corporation. He stated that Construction, Inc., had no goodwill as a corporation or as a firm, apart from Trotz's personal experience and knowledge. We stated in Danco Co., 14 T.C. 276, 284 (1950): Indeed, it has long been held that "Ability, skill, experience, acquaintanceship, or other personal characteristics or qualifications [of an officer or employee] do not constitute good will as an item of property [to the corporate employer] nor do they exist in such form that they could be the subject of transfer." Moreover, in the instant cases Trotz had no contractual obligation to continue his services with Construction, Inc. In Ruth M. Cullen, 14 T.C. 368, 372 (1950), we specifically noted: The personal ability, personality, and reputation of [the shareholder-officer] did not belong to the corporation as intangible assets, since he had no contractual obligation to continue his connection with it. The fact that petitioners' shares represented a "control" of Construction, Inc., would not add value to such stock since a prospective purchaser *133 of Construction, Inc.'s stock would not be interested in acquiring Construction, Inc., as a going concern but would be interested only in purchasing its underlying assets. Consequently, "control" of Construction, Inc., would not be considered of any particular value and a buyer would not pay a premium for control as one might in purchasing stock representing a controlling interest in a corporation having a going concern value. Respondent also argues, on the basis of Smith's testimony, that Trotz's option to purchase Kelly's stock increases the value of petitioners' shares. We believe that respondent's argument is both legally and factually untenable. Initially, we note that the option was not attached to petitioners' stock in Construction, Inc., but was a separate asset owned by petitioners. They could dispose of either their stock or the option while retaining one or the other. Secondly, section 1239 speaks in terms of the value of the stock which a taxpayer owns in a specific corporation and not any other rights which that taxpayer may hold against the same corporation. Finally, we do not believe that the option herein had any particular value since Construction, Inc., (1) lacked *134 going concern value and (2) had market value only in terms of its underlying assets. For the reasons stated above, we find as a fact that the value of petitioners' shares in Construction, Inc., did not exceed 80 percent of the value of the total outstanding stock of Construction, Inc. Therefore, we hold for petitioners on this issue. Decision will be entered under Rule 50. Footnotes
1. An issue raising depreciation in year of sale was raised during the first trial proceeding herein. This Court resolved that issue against respondent. That issue is not involved herein.↩
2. Robert C. Smith worked in the credit department of the Valley National Bank from January 1955 until March 1956 doing credit analysis. Some loans were made to contractors. At the time of the trial herein Smith was employed by a brokerage firm located in Phoenix, Arizona, and a member of the New York Stock Exchange.↩
3. As of the date of the trial proceedings herein, James H. Ryan had been in the road and bridge construction business in New Mexico since 1929. He served as president and majority shareholder of a construction company since 1953, the year in which he incorporated his construction business. ↩
4. As of the date of the trial proceedings herein, John W. Jones had been a highway contractor for about 20 years. He conducted his road construction business in corporate form and is the majority shareholder and president of that corporation. He served for two years, 1960 and 1966, as president of the New Mexico chapter of the Associated General Contractors of America.↩