**MID–AMERICA INDUSTRIES, INC., a Delaware corporation, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. FS–70–C–40.**

United States District Court,
W. D. Arkansas,
Fort Smith Division.

April 19, 1972.

Eugene G. Sayre, Dept. of Justice, Dallas, Tex., for defendant.

Ben L. Paddock, of Warner, Warner, Ragon & Smith, Fort Smith, Ark., for plaintiffs.

## MEMORANDUM OPINION

PAUL X. WILLIAMS, District Judge.

This is an action for the recovery of federal corporate income taxes and interest assessed and collected from the plaintiffs for the year 1964 through 1967. This Court has jurisdiction under the provisions of 28 U.S.C. § 1346(a) (1) and venue is proper pursuant to 28 U.S.C. § 1402(a) (2). The case was tried to the Court without a jury, thereafter argued orally, and excellent briefs were filed.

1. The parties have agreed and the Court finds that as between Mid-America Industries, Inc., a Delaware corporation, and The Automotive, Inc., an Arkansas corporation, the latter is the proper successor to the claims of the Parent in this action.

2. The parties have agreed and the Court finds that The Automotive Inc., of Okla-

The Automotive, Inc., formerly a Delaware Corporation (the "Parent") [1], and each of its above-captioned partially-owned subsidiaries (the "Subsidiaries") [2] claimed separate surtax exemptions on their returns for 1964 through 1967. The Commissioner of Internal Revenue ruled that the Parent and Subsidiaries were members of a "controlled group" as defined in 26 U.S.C. § 1563 [3]. Deficiencies were assessed against and paid by the Parent and Subsidiaries as set forth in Exhibit A to the Complaint. Claims for refund were denied, and this action was timely commenced.

Some of the facts were stipulated, and witnesses, consisting of various officers, directors and employees of the corporations involved, and an attorney (who advised the Parent upon certain matters as hereinafter discussed) testified at the trial. Preliminary to a specific consideration of the issues, a review of the history and operation of the corporations involved, which the Court finds reflected by the evidence, is appropriate.

### Period 1920–1948

Automotive Inc., a Delaware Corporation, hereafter referred to as "Automotive" was incorporated in 1920 as a jobber of automotive parts. It was a closely held corporation with its outstanding stock owned by less than fifteen shareholders. As a result of many factors, including but not limited to, continuously following a policy of paying small dividends and reinvesting earnings, Automotive experienced substantial growth. As its business grew, there arose a desire among long-standing employees to purchase stock, but the original stockholders did not wish to sell or dilute their holdings.

homa City was wholly owned by Parent for the years in question, and said corporation is not included under the term "Subsidiaries" herein.

3. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

*Period 1948–1957*

Management of Automotive favored the establishment of some form of employee ownership, and in *1948* when there arose an opportunity to acquire a jobbing store in Tulsa, Oklahoma, management decided to permit its employees to purchase the Tulsa enterprise. "The Automotive, Inc., of Tulsa" was incorporated and its total stock was owned by approximately fifty employees of Automotive, which did not acquire any stock in "The Automotive, Inc., of Tulsa." Operations of the Automotive, Inc., of Tulsa were moderately successful, but from time to time some of the employee-stockholders, for various reasons such as retirement or simply from an economic need, desired to liquidate their investment, but encountered difficulty, because there was no available market upon which sales of the stock could be made expeditiously and for a reasonable price.

*After 1957*

By 1957, the Automotive owned and operated a large number of jobbing stores in a widely scattered geographical area of Arkansas, Oklahoma and Texas. At that time, management decided to divide this structure into a number of smaller corporations, each of which would own and operate the store or stores located within a particular trade area. Management considered one of the advantages of this reorganization to be the opportunity it would provide for establishing employee stock ownership in these smaller corporations.

Smaller corporations were organized as of the beginning of the year *1958*. Employees of the various Subsidiaries and of Automotive purchased approximately 22% of the shares of the single class of common stock issued by each of the Subsidiaries, with Automotive owning the remainder.

In planning the organization, management considered it desirable to provide a means by which a fair and orderly market for the stock of the Subsidiaries could be permanently maintained. It was anticipated, (based on the Tulsa experience), that there would be no public market for the stock, and that the only demand for the stock would come from employees. It was also anticipated that there would be a tendency of such demand at any given time to focus upon the stock of the then more profitable Subsidiaries, and it was believed that this would lead to difficulty for stockholders who found it necessary to liquidate their investment as in the case of The Automotive, Inc., of Tulsa. Management consulted with counsel, C. R. Warner, Jr., and it was decided that an independent entity capable of maintaining an orderly market for the stock of the Subsidiaries was needed.

As of the beginning of 1958, therefore, The Automotive Employees Securities Corporation (the "Securities Corporation") was organized; and to provide the Securities Corporation with the power necessary for its maintenance of an orderly market, all of the stock of the Subsidiaries was issued subject to a condition (the "Condition") as follows:

> No transfer of common stock of this Corporation shall be valid, whether by sale, gift, devise, inheritance, operation of law, levy or legal process, foreclosure of lien, or otherwise, until thirty (30) days after the Company, through its Secretary, shall have had written notice by certified mail of the proposed transfer, and the number of shares proposed to be transferred. During such thirty-day period the Automotive Employees Securities Corporation, an Arkansas corporation, shall have the sole option to buy said shares at the book value as shown by the books of the corporation at the last preceding annual audit, less dividends paid thereafter. Such option may be exercised by the Automotive Employees "Securities Corporation" by written notice to the last known address of the shareholder of record within the option period. This option in favor of Automotive Employees Securities Corporation shall also arise whenever the owner of any share, or

shares, of common stock ceases to be an active employee for whatever cause —resignation, retirement, discharge, transfer or otherwise, of the one of the following companies by which he is employed at the time he acquires said stock:

[There follows a list naming all the Subsidiaries.]

said option to be exercised as set forth above within thirty (30) days of the termination of said active employment. Payment for such shares shall be in cash upon surrender of the certificate or certificates for said shares, properly endorsed.

If the aforesaid option shall not be exercised by optionee within the prescribed time, then said share or shares may be retained or transferred to any person whomsoever, provided, however, that failure of optionee to purchase any share or shares of common stock under its option, and the sale or transfer to any other person, or the retention of said shares by an ex-employee, shall not as to the future sale or transfer of said shares or share, or of any share or shares issued in lieu thereof, discharge any such share or shares of common stock from any of the restrictions herein contained; it being the intent that all restrictions hereby imposed upon the sale or transfer of shares of common stock shall apply to all such shares, whensoever, howsoever or by whomsoever acquired in the hands of all holders or owners, whether original shareholders or subsequent purchasers or transferees and whether acquired through the voluntary or involuntary act of a shareholder, or by operation of law, and whether a part of the first authorized issue or of any subsequent or increased issue. In the event that any share, or shares, shall be transferred or retained in violation of this restriction, then payment of all dividends shall be suspended upon said share of stock forthwith.

At all times material to this action, the Parent, the Subsidiaries and the Securi-

ties Corporation were validly existing and operating separate corporations in good standing under the laws of the states of their respective incorporations.

The incorporators of the Securities Corporation were C. R. Warner, Jr., one of his law partners, Heartsill Ragon, and John Swafford, a certified public accountant. Automotive, for many years had been a client of the law firm of which Mr. Warner and Mr. Ragon were partners and of the accounting firm operated by Mr. Swafford. Mr. Warner was also a director of Automotive. Mr. Warner, Mr. Ragon and Mr. Swafford were and remained the sole stockholders, officers and directors of the Securities Corporation until the end of *1966*, when they sold their stock, which (together with additional stock of the Securities Corporation) was purchased by a group of fourteen employees of Automotive. A total of twenty-four shares of stock of the Securities Corporation was purchased by said fourteen employees. With no one of them owning more than two shares. During 1967, three officer employees of Automotive owned stock of the Securities Corporation, as follows: J. Rodden, President of Automotive, owned one share; Nathan Dodd and William Chumley, Secretary and Vice-President, respectively, of Automotive, owned either one or, at the most, two shares each. Neither Mr. Rodden, Mr. Dodd nor Mr. Chumley were officers or directors of "Securities Corporation."

With the single exception that during 1964 and 1965 C. R. Warner, Jr., Attorney, was the trustee of a trust which owned a small number of shares of Automotive. No shareholder of Automotive was ever also a shareholder of the Securities Corporation.

Throughout their corporate existence, none of the stock of any of the subsidiaries was sold to anyone who was not an employee or shareholder of Automotive or its subsidiaries.

Upon notice of an employee-stockholder's desire to sell stock in the Subsidiaries, or, of his retirement or his otherwise ceasing to be an employee, the Se-

curities Corporation consistently exercised its thirty-day option to purchase the stock at book value as shown by the last preceding annual audit, less dividends thereafter. The Securities Corporation held the stock it purchased until it was apprised of sufficient demand by other employees to buy, at which time it sold the stock, in such combinations as it saw fit, at the then book value shown by the last preceding audit, less dividends paid thereafter. The Subsidiaries followed a consistent practice of paying at least 90% of earnings out as dividends. The effect of the market thus maintained was that both employee-stockholders and the Securities Corporation received all of the earnings for the stock during the period of their respective ownership of the stock, i. e., 90% of earnings were paid as dividends and the 10% of earnings retained would increase the book value at which the stock would be sold. With this income, plus an annual contribution of $25.00 per year from each of the Subsidiaries, the Securities Corporation operated at a profit. On occasions when the Securities Corporation did not have the funds to effect a purchase of stock, it would borrow the necessary money. All of the loans of the Securities Corporation were obtained from the Merchants National Bank of Fort Smith, Arkansas, with the exception of two which were obtained from Automotive in 1967. All loans were evidenced by promissory notes of the Securities Corporation payable with interest at the rate of 6% per annum, and the Securities Corporation was the sole obligor.

Subsequent to 1958 this plan of operation was followed to the mutual satisfaction of management and the employees of Automotive and its subsidiaries and no objection was made by the taxing authorities until some time after 1967 when the income tax returns of Automotive and its subsidiaries were audited by the Internal Revenue Service for the years 1964 through 1967, and it was determined by I.R.S. that Automotive and its subsidiaries constituted a "controlled group of corporations" as that term is used in Section 1561 of the Internal Revenue Code of 1954 as amended. The Service allowed this group of corporations only one surtax exemption as provided by Section 11 of the Internal Revenue Code, and disallowed the other fifteen surtax exemptions.

The corporation group, following notice of the Internal Revenue Service determination, elected to pursue an alternative course of action and rather than absorbing the tax consequences of the disallowance elected under Section 1562 of the Code to retain their surtax exemptions, and to pay an additional six (6) percent tax on the first $25,000 of taxable income of each corporation. Having availed themselves of this option, and paid such additional six (6) percent, they thereafter filed this suit to recover the same, contending that they were not members of a controlled group as defined in the statute.

The present suit is an action for the recovery of the sums so paid under protest.

The question presented is whether the Automotive, Inc., a Delaware Corporation and its subsidiaries constitute a "controlled group of Corporations" as that term is used in Section 11, 1561 and 1563 of the Internal Revenue Code of 1954 as amended by Act of 1964 and the Regulations promulgated thereunder.

26 U.S.C. § 11 provides that the taxable income of a corporation up to $25,000 is subject to a normal tax, and that the excess of taxable income over $25,000 is subject to both the normal tax and an additional surtax. The absence of the surtax on the first $25,000 of taxable income is referred to as the "surtax exemption." 26 U.S.C. Sections 1561 and 1563 were added to the Code in 1964, by Section 235(a) of the Revenue Act of 1964, Pub.Law 88–272, 88th Cong. 2d Sess., approved February 26, 1964.

Section 1561 provides that if a controlled group of corporations as defined in Section 1563 exists, the corporations which are component members shall not be entitled to separate $25,000 surtax

exemptions; instead, only one $25,000 surtax exemption, to be apportioned among the members, will be allowed.

Section 1563 provides that a parent corporation and its subsidiaries are component members of a controlled group if the parent owns stock of the subsidiary "possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock." 26 U.S.C. Section 1563(a) (1) (A) (B).

Section 1563 further provides that in determining whether the parent corporation's ownership of the outstanding stock of a subsidiary is at least 80 percent, stock of the subsidiary held by certain persons shall be excluded and treated as not outstanding.

26 U.S.C. Section 1563(c) (2) (A) (ii) provides as follows:

"(ii) stock in the subsidiary corporation owned by an individual (within the meaning of subsection (d) (2)) who is a principal stockholder or officer of the parent corporation. For purposes of this clause, the term 'principal stockholder' of a corporation means an individual who owns (within the meaning of subsection (d) (2)) 5 percent or more of the total combined voting power of all classes of stock entitled to vote or 5 percent or more of the total value of shares of all classes of stock in such corporation."

There is no controversy in this action respecting the application of this Section 1563(c) (2) (A) (ii). In Exhibit B to the stipulation of the parties, the total number of the shares of outstanding stock of each of the Subsidiaries which were owned by either officers or more than 5% stockholders of the Parent for each of the tax years in question is set forth, and it is agreed that such shares are to be excluded. As shown on Exhibit B, the exclusion of such shares results in the Parent's being deemed to own at least 80% of the stock of *some* of the Subsidiaries during 1964 and 1965. For all other years for all of the Subsidiaries, it is stipulated that even after the exclusion of the shares owned by the officers or more than 5% shareholders of the Parent, the ownership of the stock of each of the Subsidiaries by the Parent was less than 80%.

26 U.S.C. Section 1563(c) (2) (A) (iii) provides as follows:

"(iii) stock in the subsidiary corporation owned (within the meaning of subsection (d) (2)) by an employee of the subsidiary corporation if such stock *is subject to conditions which run in favor of such parent (or subsidiary) corporation* and which *substantially restrict or limit the employee's right* (or if the employee constructively owns such stock, the direct owner's right) *to dispose of such stock.*" [Emphasis supplied.]

It is not disputed by the plaintiffs that the "Condition" is one which substantially restricts or limits the employee's right to dispose of the stock within the meaning of Section 1563(c) (2) (A) (iii).

The question then is narrowed to whether or not the Condition "runs in favor of" Automotive or the Subsidiaries.

We hold that the Condition does not "run in favor of" the Parent or Subsidiaries within the meaning of Section 1563(c) (2) (A) (iii).

The paragraph of the Treasury Regulations directly interpretative of the above language is Reg. § 1.1563–2(b) (2) (iii), (All paragraph and page references to the regulations are to Treasury Regulations § 1.1563 as published by West Publishing Co. in 2 Federal Tax Regulations 1971) which provides:

"(2) *Stock treated as not outstanding.* If the provisions of this subparagraph apply, then for purposes of determining whether the parent corporation or the subsidiary is a member of a parent-subsidiary controlled group of corporations . . . the following stock of

the subsidiary corporation shall . . . . be treated as if it were not outstanding.

(iii) *Employees*. Stock in the subsidiary corporation owned (directly and with the application of the rules contained in paragraph (b) of § 1.1563–3) by an employee of the subsidiary corporation if such stock is subject to conditions which substantially restrict or limit the employee's right (or if the employee constructively owns such stock, the direct owner's right) to dispose of such stock and which run *in favor of the parent or subsidiary corporation. In general, any condition which extends, directly or indirectly, to the parent corporation or the subsidiary corporation preferential rights with respect to the acquisition of the employee's (or direct owner's) stock will be considered to be a condition described in the preceding sentence.* It is not necessary in order for a condition to be considered to be in favor of the parent corporation of the subsidiary corporation, that the parent or subsidiary be extended a discriminatory concession with respect to the price of the stock. For example, a condition whereby the parent corporation is given a right of first refusal with respect to any stock of the subsidiary corporation offered by an employee for sale is a condition which substantially restricts or limits the employee's right to dispose of such stock and runs in favor of the parent corporation. Moreover, any legally enforceable condition which prohibits the employee from disposing of his stock without the consent of the parent (or a subsidiary of the parent) will be considered to be a substantial limitation running in favor of the parent corporation." [Emphasis supplied.]

The "Condition" heretofore referred to give rise, (upon notice of an employee-shareholder's desire to sell stock of the Subsidiaries or, upon his retiring or otherwise ceasing to be an employee) to a thirty-day option to purchase in favor of "the Securities Corporation." We think that a condition providing for preferential rights respecting the acquisition of stock would normally be said to run in favor of" the person or persons who are entitled to exercise such preferential rights. In this sense, it is clear that the ·Condition "runs in favor of" the Securities Corporation. Neither the provisions of the *Condition,* nor anything else in the record, confer any rights or preferences respecting the stock to anyone except the Securities corporation.

Defendant contends that the Condition operates to "benefit" Automotive and therefore directly or indirectly runs in its favor, by "assuring its control of the identity of the minority shareholders and by providing it with stock to offer to employees as an inducement to their continued employment." We find that the Condition does not assure Automative any such benefits because only the Securities Corporation is extended rights under the "Condition" respecting acquisition of stock. Irrespective of whom the Condition may by speculation be considered likely to provide with theoretical benefits, under the language of the statute in question, it "runs in favor of" only the Securities Corporation. "Run in favor of" is not used in the statute as the equivalent of "benefit." The language of Section 1563(c) (2) (A) (iii) in question appears in two other paragraphs of Section 1563: Section 1563 (c) (2) (B) (ii) (relating to excluded stock respecting "Brother-Sister controlled groups"); and Section 1563(e) (5) (D) (relating to constructive ownership of spouse's stock). The paragraphs of the Regulations specifically directed to these two provisions both provide that the principles of the above-quoted Reg. § 1.1563–2(b) (2) (iii) shall apply in determining whether a condition is one which renders stock

excludable or constructively owned. Reg. § 1–1563–2(b) (4) (ii); Reg. § 1.1563–3(b) (5) (ii) (d). Regulations require a consistent meaning for the same language in all three of the paragraphs of Section 1563 in which it appears. An analysis of the use of "run in favor of" in these other paragraphs of Section 1563 apparently confirm our construction.

■ Defendant urges that even if the Condition technically runs in favor of only the Securities Corporation, we should arbitrarily attribute to Automotive either the ownership of the Securities Corporation itself, or the right extended to the Securities Corporation under the "Condition." Defendant points to nothing in the provisions of the statute to support this contention, but urges that it is a sham transaction and should not be given effect and that substance must govern over form. We find no evidence to support a holding of sham or lack of substance. To the contrary, there is substantial evidence of substance and reality, both economic and otherwise.

First, let it be noted that this procedure for the benefit of the employees was already in force and practice long before the 1964 amendments and that it was initially put in practice because of the experience employees encountered in the Tulsa store back in the 1948–57 period.

Next, let it be noted that the profit from the operation of "Securities" was divided among the stockholders of "Securities." While this amount was not great, it was and is a factor in determining the separateness of "Securities" and whether or not it was a controlled corporation.

Next, it is undisputed that neither Automotive nor the Subsidiaries had any legal means of dominating or controlling either Securities Corporation or the employee-stockholders in their transactions with the Securities Corporation. Securities Corporation was owned and operated, and its transactions with employee-stockholders were effected without control or domination by the Parent or Subsidiaries. Further, the evidence shows that no attempt was made by or on behalf of the latter at such control or domination.

The operation was a mutually satisfactory way to permit an employee to own stock and thus be motivated to work for the best interest of the organization of which he was a part owner; and at the same time know that if and when he had to sell or desired to sell his stock he would be assured of getting at least book value for it, if and for so long as "Securities" was a going concern and continued to exercise its option. And of course there can be no basis for complaint in those instances where Securities Corporation fails or refuses to exercise its right of first refusal.

Defendant points to the fact that the stock of Securities Corporation was owned at first by lawyers (one of whom was a director of Parent) and an accountant (of whom the Parent was a long-time client) and by subsequent employees of Automotive; and argues that such lawyers and accountant and all employees can be assumed as a practical matter, (or in substance) to be dominated and controlled by Automotive. While this conjectural assumption may have abstract merit, we think it the province of Congress, not this Court, to make such an assumption a part of the rules of stock attribution or exclusion under Section 1563.

■ Defendant also contends that Congress intended the surtax exemption (and the tax rate reduction in 1964 in connection therewith) to benefit "small business," and that Sections 1561–1563 were added to carry out this purpose without granting the same benefits to medium and large enterprises using the multiple corporate form of organization. See 1964 U.S.Code Cong. and Adm. News, pp. 1426–27. It is clear, however, that only the component members of a "con-

trolled group of corporations" are denied full, separate surtax exemptions by the statute. Neither the size of the enterprise conducted by the corporations nor the number of corporations is material in the determination of whether a controlled group actually exists under Section 1563.

Defendant also refers to the statement by a leading commentator that the general purpose of the exclusion and attribution provisions of Section 1563 "is to frustrate efforts to avoid these provisions by decontrol tactics that reduce effective dominion over the stock in form only." See Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, 3rd Ed., Par. 15.03 at 16. While this generalization may be abstractly correct, we do not consider the Condition in the instant action as a "decontrol tactic."

We again note that the condition written into the stock certificate was long prior to the amendments to the tax statutes in 1964.

We also again note that Securities Corporation was incorporated and began functioning as a separate corporation entity long prior to 1964.

The entire operation was a step in good employee relations and was so long prior to 1964 that it is unlikely to have been in anticipation of the 1964 Amendment.

The standards of Section 1563 appear more likely to be the result of practical compromises made by Congress after considering the contentions of all interested affected.

■ In any event it would be improper for us to make such an assumption. See Mitchell v. Commissioner of Internal Revenue, 300 F.2d 533 (4th Cir. 1962); Rothenburg v. United States, 350 F.2d 319 (10th Cir. 1965) Trotz v. Commissioner of Internal Revenue, 361 F.2d 927 (10th Cir. 1966).

As stated by the Ninth Circuit in rejecting a similar approach by Defendant in the area of loss carry-overs:

"It is quite unlikely that the stated purposes of certainty, consistency and objectivity are to be achieved if each court considering a loss carryover problem adds a gloss of judicial exceptions reflecting what a particular judge or group of judges think Congress should have done, rather than what it did. An expression like 'trafficking in loss carryovers' is a question-begging epithet which clouds reason. A dispassionate consideration of the 1954 Code must lead to the conclusion, we believe, that Congress has deliberately sanctioned such so-called 'trafficking' in those situations where it is not expressly abjured.

"This is not to say that the language of the 1954 Code is to be given a sterile, mechanical, literal application. The courts must give sense and vitality to that language, but this must be done within the framework of the Code to achieve the Congressional design. . .

"Sometimes plain statutory language is distorted by courts to achieve what appears to be a just result in a particular case. The Government seeks to have this Court do that with respect to Sections 172, 382, and 269 to attain what it deems to be the just result in this case. . . .

"Taxation is peculiarly a matter of statutory law, and in applying that law to the determination and computation of income and deductions, the Courts do not make moral judgments. There is nothing perfidious or invidious in enjoying a statutory deduction from reportable income. It is not a matter of conscience but of statute and the determination of Congressional intent. In our opinion, Congress has quite plainly said that net operating loss deductions should be allowed unless the special circumstances inter-

preted within the letter and spirit of Sections 382(a) and 269 obtain. The conditions disallowing the deduction have not been established here. It is of much more importance that businessmen, accountants, lawyers and revenue agents should retain confidence that plain statutory language means what is says and what it reasonably implies than that a particular deficiency assessment should be sustained. We cannot, within the statutory framework applying a fair and reasonable interpretation to the language used, disallow to Maxwell Hardware the net operating loss deduction."

Maxwell Hardware Co. v. Commissioner of Internal Revenue, 343 F.2d 713, at 718, 719, 721 and 723. (9th Cir. 1965).

Defendant cites Barton Naphtha Co. v. Commissioner of Internal Revenue, 56 T.C. 107; Paragraph 56.11, P–H TC at 56 (1971). In that case the conditions to which the stock owned by employees of the brother-sister corporations was subject, expressly "ran in favor of" the brother-sister corporations themselves. Thus the question in this action was not present in *Barton*. The taxpayers in Barton argued that the terms of the condition, which were basically the same as those of the Condition in this action, did not substantially restrict the employees' right to dispose of the stock. The Tax Court rejected this argument, but we find nothing in *Barton* to support the proposition that the employee owned stock could have been excluded if the conditions had "run in favor of" a separate corporation wholly owned by the employees themselves.

During trial of this action, Defendant's contention that the Parent and Subsidiaries constituted a controlled group of corporations for the years in controversy was limited to the effect of Section 1563 (c) (2) (A) (iii).

■■ Defendant now raises for the first time, two other arguments. One is that the "Condition" running in favor

of Securities Corporation should be construed to be an "option" within the meaning of Section 1563(e) (1), with the result that the Securities Corporation would be deemed to own all of the outstanding stock of the Subsidiaries and the Parent. We hold that the Condition is not an "option" in favor of the Securities Corporation within the meaning of Section 1563(e) (1). The Securities Corporation does not, under the terms of the Condition, have a *"presently or continuously existing option to purchase"* any stock. The thirty-day option does not come into existence until the occurrence of one of the contingencies specified in the Condition, and Securities Corporation has no control over the occurrence of any such contingencies. The rights which "run in favor of" the Securities Corporation constitute essentially rights of "first refusal." In *Barton*, supra, where the language of the condition was essentially the same as in the instant action, the Tax Court so held. Barton Naphtha Co., Paragraph 56.11, P–H TC at pp. 56–77 (1971). We hold that to constitute an option to purchase stock, the rights in question must enable the holder to purchase the stock "presently at his election." This generally accepted meaning of "option" appears to be recognized by the Internal Revenue Service. See Rev.Ruling 68–601, 1968–2 Cum.Bull. 124.

■ The second of the arguments made by Defendant is that since the Parent can be said to own, after the stipulated application of the exclusion provisions of Section 1563, almost 80% of the shares of stock outstanding in each of the Subsidiaries, the Court should deem the Parent to own, within the meaning of Section 1563(a) (1) (A), "at least 80% of the total value of shares of all classes of stock" of each of the Subsidiaries. Since each share of the single class of common stock of each of the Subsidiaries is identical, we find that intrinsically they must be deemed to have the same value. The Defendant's argument is that the statute calls for a fur-

ther inquiry which would involve factual determinations by the Court as to whether the shares comprising the Parent's majority ownership would bring a higher price per share upon the market for such stock, if any, than the intrinsic value of such shares and, if so, how much more. We find no evidence in the record to support findings for Defendant on such factual questions, and that even if the inquiry urged by Defendant were appropriate under the statute, the burden of proof thereon must be placed on the Defendant in this action. We accordingly hold that the Defendant cannot prevail on this basis.

Defendant relies on United States v. Parker, 376 F.2d 402 (5th Cir. 1967) involving Section 1239, which denies capital gains treatment to an individual on a sale of depreciable property by the individual to "a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren." The *Parker* case is one of two in which the government has contended and the courts have held that a numerical count of outstanding shares does not necessarily determine the percentage of value for purposes of Section 1239. The other, decided by the Tenth Circuit prior to the *Parker* decision, is Trotz v. Commissioner of Internal Revenue, 361 F.2d 927 (10th Cir. 1966). In *Trotz*, the taxpayers owned 79% of the shares of the only class of stock outstanding. The remaining 21% of the shares were owned by an employee of the corporation. The employee was bound by an agreement giving taxpayers the right to purchase employee's stock in the event the employee should die or cease to be an officer or director of the corporation. The Court of Appeals for the Tenth Circuit reversed the Tax Court's decision for the government on another ground, but held that the language of Section 1239 compelled it to remand for a determination of the value question by the Tax Court:

"We make no comment on the claim that the taxpayer in fact owned more than 80% in value of the outstanding stock. This presents a factual issue for determination in the first instance by the Tax Court. All we hold is that a numerical count of outstanding shares, in and of itself, does not determine the percentage of value." (361 F.2d at 930)

On remand, the Tax Court made the required factual determinations, on the basis of the evidence fully presented on the issue at the previous trial, and held that taxpapers' 79% stock ownership was worth no more than 79% of the value of all the outstanding stock. (*Trotz*, Par. 67–139 P–H Memo TC (1967)

In the *Parker* case, supra, the taxpayer owned exactly 80% of the shares of the outstanding stock. The remaining 20% of the shares were owned by an employee of the corporation. All of the shares were subject to a restriction on transfer which granted the corporation a right of first refusal. The shares owned by the employee only were also subject to employee's agreement with taxpayer that upon termination of employee's employment, employee's share would be purchased by taxpayer. In reversing the District Court, the Court of Appeals for the Fifth Circuit held:

"We next note in the present case [the employee] owned exactly 20 per cent of the outstanding stock and [the taxpayer] owned exactly 80 per cent. Therefore, if any fact can be found which shows that the value per share of [the taxpayer's] stock exceeded by any amount, no matter how small, the value per share of [the employee's], then [the taxpayer] owned more than 80 per cent in value of the outstanding stock.

"While it is true that [the taxpayer] and [the employee] owned the same class of stock, [the employee's] stock was burdened with impedimenta from which [the taxpayer's] stock was free. We hold that as a matter of law these impedimenta must have decreased the value per share of [the employee's] stock, and as we need only show that this value per share was lower by any

indeterminate amount, no matter how miniscule, than the value per share of [the taxpayer's] stock, we are able to render judgment here without remand . . . . In this aspect the present case differs from Trotz v. Commissioner of Internal Revenue, supra. There, the taxpayer Trotz owned 79 per cent of the outstanding stock and the lesser shareholder owned 21 per cent. The Tenth Circuit remanded the case for a factual determination by the Tax Court of whether any difference between the values per share of the large and small blocks brought Trotz's holding above 80 per cent in value. In contrast, in the present case any extra value per share in [the taxpayer's] stock will bring this holding above 80 per cent in value. No determination is needed of how much more per share [the taxpayer's] stock is worth."

(376 F.2d at 408)

In the instant case, as in *Trotz*, it would not be sufficient to find an "indeterminate" excess of value per share of the majority blocks of stock. This Court would have to determine both the existence and amount of any such excess, and there is no evidence in the record to support such findings.

Additionally, on the facts of this action, we read neither Section 1563 nor the interpretative regulations to call for a determination of whether to attribute either excess "voting power" or "value" to shares held by the majority shareholder. See e. g., Reg. § 1.1563–2, example (2) at pg. 513, example at pg. 514; Reg. § 1.1563–3, example at pg. 516, example at pg. 517.

In light of the foregoing, we find that for the years remaining in controversy after the stipulation of the parties, the Parent and the Subsidiaries did not constitute "a controlled group of corporations" as defined in Section 1563.

It is hereby ordered, that the plaintiffs and defendant shall within fifteen days from this date submit a form of final judgment in accordance herewith to the Court.