HARRY TROTZ AND CAMILLE TROTZ, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 562–62.    Filed November 6, 1964.

128

*Leland B. Franks*, for the petitioners.
*Edward H. Boyle*, for the respondent.

FAY, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years 1958 and 1959 in the amounts of $12,043.58 and $6,400.30, respectively. By an amendment to his answer, respondent claimed an additional deficiency for the year 1958 in the amount of $3,454.59.

The issues are (1) whether petitioners owned more than 80 percent in value of the outstanding stock of Trotz Construction, Inc., within the meaning of section 1239 [1] at the time they sold construction equipment to the corporation, and (2) whether petitioners are entitled to the depreciation deductions claimed in 1958 on various items of construction equipment sold by them in that year at prices in excess of their undepreciated basis therein at the beginning of the year.

FINDINGS OF FACT

Some of the facts were stipulated and they are found accordingly.

Harry and Camille Trotz were at all times relevant hereto husband and wife. They filed their joint Federal income tax returns for the taxable years 1958 and 1959 with the district director of internal revenue, Albuquerque, N. Mex. Harry Trotz will hereinafter be referred to as petitioner.

Prior to February 1958 petitioner was owner of Trotz Construction Co., a sole proprietorship (hereinafter referred to as the proprietorship) engaged in road construction in New Mexico. At that time the proprietorship had just finished a job in a joint venture with Miller, Smith & O'Hara, Inc. During the prosecution of this contract, petitioner became acquainted with Ben F. Kelly, Jr., then a grade foreman. Kelly was not related to petitioner by blood or marriage. Petitioner proposed to Kelly that the two of them join forces in the construction business.

On February 3, 1958, petitioner, his wife, and Kelly caused Trotz Construction, Inc. (hereinafter referred to as the corporation), to be

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.

incorporated under the laws of the State of New Mexico. Pursuant to the corporate charter, 400 shares of authorized common stock, each having a par value of $100 per share, were issued on March 1, 1958, as follows:

| Name | Shares | Percent |
|---|---|---|
| Harry Trotz | 216 | 54 |
| Camille Trotz | 100 | 25 |
| Ben F. Kelly, Jr. | 84 | 21 |
| Total | 400 | 100 |

Also on March 1, 1958, the above officers adopted the bylaws of the corporation which contained the usual clauses with respect to the conduct of the corporate business. Article IV, section (7), of these bylaws provided: "Any Director or Officer may be removed from his office or position at any time with or without cause by the affirmative vote of a majority of the stockholders of the corporation." Petitioner turned over to the corporation $40,000 cash for the 400 shares of stock being issued. He purportedly loaned Kelly the $8,400 required for Kelly's purchase of 84 shares of stock of the newly formed corporation. The loan was evidenced by a promissory note. In order to secure the payment of the purported indebtedness, Kelly pledged his stock and assigned any bonus and dividend he might receive from the corporation to petitioner by a document entitled "Pledge of Stock and Collateral Agreement." Kelly delivered the endorsed certificate evidencing his 84 shares of stock to petitioner, pursuant to the "Pledge of Stock and Collateral Agreement." Petitioner retained the Kelly certificate from that time. As a further part of the same transaction Kelly, petitioner, and petitioner's wife executed on March 1, 1958, a document entitled "Option to Purchase Stock."

The document provides, in part, as follows:

1. First party [Kelly] does hereby agree that in the event he shall for any reason cease to be an officer and/or director of [the corporation] or shall die, second parties, [petitioners] or either of them, their respective heirs, executors, administrators and assigns, shall have and are hereby given an option to purchase the stock now held by first party and any further shares of [the corporation] which first party shall hold or acquire by any increase in the capital stock of the company, or otherwise, at the book value of said stock as determined by the Board of Directors of said company. In computing such book value, it is understood and agreed that no value shall be estimated for the good will, trade names, trade marks or other intangible assets.

2. It is understood and agreed that if second parties, or either of them, their respective heirs, administrators or assigns, shall not exercise within thirty (30) days after written demand from first party, their option to purchase said stock, at the book value of said stock, in cash, then first party shall have the right to sell or transfer his shares of stock to any other party, free from any of the obligations of this Agreement.

3. First party agrees that he will make no sale, transfer or pledge of said stock except subject to the option and rights herein given to second parties.

THIS OPTION AGREEMENT Shall be binding upon the parties hereto and upon their respective heirs, executors and assigns.

Immediately following the incorporation on March 1, 1958, petitioner sold substantially all of his construction equipment to the corporation for $183,153.33, which was the median market value as determined by three independent appraisers. As payment for the equipment the corporation assumed $22,933.55 of purchase money indebtedness against the equipment, paid $35,219.78 in cash, and issued to petitioner a $125,000 promissory note secured by a chattel mortgage on the equipment sold. The bill of sale that effected the transfer listed each item of equipment and the price the purchaser paid for each item. In each instance, the purchase price was in excess of petitioner's January 1, 1958, basis, with the single exception of one 12-ton Galion tandem roller. In that case the purchase price was less than the January 1, 1958, basis.

On their 1958 income tax return petitioners reflected the cost to them of the equipment sold to the corporation as $275,031.11, *the accumulated depreciation as $196,088.40*, and their adjusted basis as $78,942.71. The resultant gain of $104,210.62 was reported as long-term capital gain arising from the sale of property used in trade or business. The gain on the sale was reported on the *installment basis*, the gain for 1958 being listed as $22,892.86 and the gain for 1959 as $27,300. Respondent determined that the gain on the sale of this equipment was includable in full as ordinary income in each of the years involved.

At the first meeting of the stockholders and board of directors of the corporation, the following were elected as officers and directors of the corporation, with salary and bonuses as indicated:

| Name | Position | Salary and bonus |
| --- | --- | --- |
| Harry Trotz | President-director | $12,000 salary plus bonus of 27½% of net profits. |
| Ben F. Kelly, Jr | Vice-president-director | $9,600 salary plus bonus of 7½% of net profits. |
| Camille Trotz | Secretary-treasurer-director | $6,600 salary plus bonus of 15% of net profits. |

Kelly's employment with the corporation commenced in March 1958 and lasted until the latter part of December 1958, at which time a disagreement arose between petitioner and Kelly. Kelly, on his own volition, submitted his resignation as vice president and director of the corporation effective December 29, 1958. On January 15, 1959, petitioner wrote Kelly concerning the transfer of Kelly's 84 shares of stock and the cancellation of Kelly's promissory note in the amount of $8,400. On January 17, 1959, petitioner wrote Kelly acknowledging receipt of the certificate for 84 shares of stock, canceling the $8,400

note, and indicating return of the note to Kelly. At the time of the surrender Kelly had made no payments on the note.

OPINION

The first question for decision is whether petitioner is entitled to have his profits from the sale of his depreciable property to the corporation taxed as capital gain rather than as ordinary income. Section 1239 denies capital gains treatment for such profits when an individual sells depreciable property used in his trade or business to a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, his minor children, and minor grandchildren.[2]

Petitioner argues that he and his wife owned only 79 percent of the corporation's outstanding stock on March 1, 1958, the date of the sale, and therefore capital gains treatment is not denied by section 1239. Respondent points to the following facts: (1) That petitioner's funds were used to purchase the stock certificate issued in Kelly's name; (2) that said stock certificate, at all times relevant hereto, has been endorsed to petitioner and has been in his possession; and (3) that by virtue of the option granted to him by Kelly and the provision in the bylaws, petitioner could, at any time he pleased, have acquired legal title to the stock merely by canceling the debt purportedly owed to him by Kelly for the original purchase price of the stock. Respondent then argues that by reason of these facts petitioner, in substance, was the owner of the stock which had been issued in Kelly's name and that petitioner, therefore, is not entitled to report the gain realized as capital gain.

All of the significant events and transactions seem to have taken place on March 1, 1958, in the office of petitioner's attorney. On that date the corporation was activated by petitioner turning over to it $40,000 cash and the corporation issuing 400 shares of stock—216 shares made out to himself, 100 shares made out to his wife, and 84 shares made out to Kelly. Kelly signed a note to petitioner for $8,400 payable in 2 years from date at 6-percent interest, endorsed the stock certificate for 84 shares, and turned it over to petitioner, together with his (Kelly's) written pledge and collateral agreement as security for

---

[2] SEC. 1239. GAIN FROM SALE OF CERTAIN PROPERTY BETWEEN SPOUSES OR BETWEEN AN INDIVIDUAL AND A CONTROLLED CORPORATION.

(a) TREATMENT OF GAIN AS ORDINARY INCOME.—In the case of a sale or exchange, directly or indirectly, of property described in subsection (b)—

(1) between a husband and wife; or

(2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren;

any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231.

the note. As the same time Kelly also executed an instrument entitled "Option to Purchase Stock." That instrument provided that, for a consideration of $10 and other valuable consideration, petitioner, upon the happening of a certain contingency, would have the right to buy Kelly's 84 shares at book value, with no value ascribed to goodwill or other possible intangible assets. That instrument, together with the corporation's bylaws (also adopted Mar. 1, 1958), presented petitioner with the following choice, exercisable at will: Petitioner could leave the 84 shares in Kelly's name or he could terminate Kelly's negligible link or vestige of ownership to or in the stock by returning Kelly's note. The reason petitioner was in this position is that the contingency referred to in the so-called Option to Purchase instrument was Kelly's failure to remain as an officer and/or director of the corporation; and petitioner had the absolute right to terminate Kelly's employment as such at will. For the bylaws authorized a majority stockholder, which petitioner was at all times relevant hereto, to remove a director or officer from his office or position "at any time with or without cause." Thus, in the March 1, 1958, transactions, petitioner first acquired the right to all 400 shares of the corporation by his contribution of $40,000 cash. He then relinquished the right to have 84 of the shares issued in his name, but he did not relinquish his control over or, in effect, his actual ownership of the stock which had been issued in Kelly's name. He was in a position to, and did in fact, exercise complete and absolute control over these shares on the very day he sold his depreciable assets to the corporation.

Section 1239 was designed to cover situations such as occurred in the instant proceeding where low-basis property is sold by a stockholder to his controlled corporation. It is designed to operate in such a way that it will deprive a seller of the advantage of capital gains treatment when the seller is a stockholder who is dealing with a corporation in which he owns more than 80 percent of the outstanding stock in value.

Petitioner's rights with respect to the stock issued to Kelly were so complete that they were tantamount to ownership by petitioner for purposes of section 1239. This result is indicated by the provisions of the statute which attribute to a taxpayer ownership of stock held by his wife, minor children, and minor grandchildren. Obviously Congress, in enacting this provision, presumed that a taxpayer would control such stock held by others by virtue of the family relationship. It necessarily follows that where the taxpayer's control of stock standing in another's name is created by a contractual relationship such as the one involved herein (as revealed by the terms of the apposite agreements), petitioner is given a more absolute and complete control than might be presumed to arise from the particular familial relationships mentioned in the statute. To hold otherwise

would completely destroy the statute. It could not be effective if an individual could avoid the tax by restricting issuance of stock in his name to 79 percent, but retaining the strings of ownership over the other 21 percent issued in another's name. The document which Kelly executed is in form an *option* but in reality, when considered together with the bylaws, it amounted to a contract by Kelly to turn over the stock, issued in his name, to petitioner whenever petitioner wanted him to do so. Therefore, at the time of his sale of depreciable assets to the corporation on March 1, 1958, petitioner and his wife, in substance, owned 100 percent of the stock although legal title to 21 percent of the stock was in Kelly. Petitioner could acquire title to these shares at will. We hold under the facts here that petitioner owned more than 80 percent in value of the corporation's outstanding stock on March 1, 1958. Therefore, the gain petitioner realized upon the sale of his assets that day to the corporation should be taxed as ordinary income.

Petitioner relies heavily upon *Mitchell* v. *Commissioner*, 300 F. 2d 533 (1962), reversing our decision in 35 T.C. 550 (1960). There on the date the taxpayer sold his depreciable property to the corporation he, and his spouse, and his minor children, owned directly 79.54 percent of the stock, and irrevocable trusts created for two minor children owned 12.21 percent of the outstanding stock. The Court of Appeals held that the stock owned by the bank as trustee for the children was not owned by the children. However, the opinion in that case recognized the word *"owned"* in the statute should be defined in terms of *control* and the court reasoned stock held by a trustee would not be under the taxpayer's *control*. See *Mitchell* v. *Commissioner, supra* at 537. Our opinion here is well within the rationale of *Mitchell* v. *Commissioner, supra*. There the opinion indicates the control was based only upon "a spirit of confidence and cooperation, [which] does not fit into the scheme of section 1239." Here the control over the minority stockholding, as established by the signed contract, virtually amounted to complete control and, therefore, was tantamount to ownership for purposes of section 1239.

Despite the fact that we have concluded that all of petitioner's gain on the sale of the assets constitutes ordinary income, it will be necessary for us to consider the depreciation issue because petitioner elected to report his gain on the installment method.[3] Respondent, by way of amended answer, raised an affirmative issue whereby he disallowed the depreciation claimed by petitioner on the equipment sold by his proprietorship to the corporation. The burden of proof therefor is on respondent.

---

[3] A disallowance of the depreciation claimed for the year 1958 would result in an adjustment whereby the gain reported in the first year would be slightly increased and the gain to be reported in later years would be correspondingly lower.

Respondent's sole reason for disallowing the depreciation claimed is that the amount received by petitioner for the equipment on March 1, 1958, the date of the sale, was in excess of petitioner's undepreciated or adjusted basis in the equipment as of the beginning of the year of sale. It is respondent's position that, under such circumstances, no deduction for depreciation is allowable as a matter of law.

In two very recent court-reviewed opinions, *Macabe Co.*, 42 T.C. 1105 (1964), and *Smith Leasing Co.*, 43 T.C. 37 (1964), this Court held that there is no such rule of law.

We have been able to find nothing in the record before us to indicate that the estimates used by petitioner in his depreciation schedules for these assets were inaccurate or that gain realized by him in connection with their sale did not, in its entirety, result from market appreciation. Therefore, we conclude that the depreciation claimed by petitioner for the year in question was proper and is allowable in full.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

BRUCE, *J.*, dissenting: I respectfully dissent from the opinion of the majority on the first issue. In my opinion, petitioner did not *own* more than 80 percent in value of the outstanding stock of Trotz Construction, Inc., within the meaning of section 1239 of the Internal Revenue Code of 1954, at the time he sold his construction equipment to the corporation. Section 1239(a)(2) denies capital gains treatment with respect to profits received by an individual upon the sale of depreciable property used in his trade or business to a corporation "more than 80 percent in value of the outstanding stock of which is *owned* by such individual, his spouse, and his minor children and minor grandchildren." (Emphasis supplied.) The word "owned" does not mean "in effect," "tantamount to," or "in substance." As was stated by the Court of Appeals for the Fourth Circuit in the case of *Mitchell* v. *Commissioner*, 300 F. 2d 533, 536 (1962), reversing 35 T.C. 550:

the Internal Revenue Code is specific whenever tax consequences depend upon the equitable ownership of stock, as contrasted to its legal ownership. The failure to specify in section 1239 that beneficial ownership is to be included in computing the 80% limit strongly indicates that the beneficial ownership of stock is not to be counted.

In my opinion, stock which is not *owned* but which the taxpayer had only a contract right to acquire, is likewise not to be included in computing the 80-percent limit provided by the statute. On this issue I would hold for the petitioner.

Mulroney, *J.*, dissenting with respect to the second issue: I read *Fribourg Navigation Co.* v. *Commissioner*, 335 F. 2d 15, and the opinion of this Court which it affirms,[1] as interpreting the phrase "reasonable allowance" in section 167(a), I.R.C. 1954, as excluding as unreasonable any allowance for depreciation in the year the asset is sold for more than its depreciated cost. Here, as in *Macabe Co.*, 42 T.C. 1105 (1964), and *Smith Leasing Co.*, 43 T.C. 37 (1964), this pronouncement of the Second Circuit in *Fribourg* is not accepted by the majority as a rule of law. I would hold it is a sound rule of law upon the reasoning set forth in the opinion, and that this Court should follow, especially because it is announced by an appellate court in an opinion affirming this Court. I would hold for respondent on the issue.

Tietjens and Pierce, *JJ.*, agree with this dissent.

---

[1] *Fribourg Navigation Co.*, T.C. Memo. 1962–290.