HIROTOSHI YAMAMOTO AND SHIZUKO YAMAMOTO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9726–75.     Filed February 28, 1980.

Hirotoshi Yamamoto, pro se.
*Peter D. Bakutes*, for the respondent.

OPINION

CHABOT, *Judge:*[*] Respondent determined deficiencies in Federal income tax against petitioners as follows:

| Year | Deficiency |
| --- | --- |
| 1970 | $5,057.93 |
| 1971 | 75,577.47 |

[*]By order dated July 21, 1978, the Chief Judge reassigned this case from Judge Charles R. Simpson to Judge Herbert L. Chabot for disposition.

In his amended answer, respondent seeks to increase the deficiency determination for 1970 by $30.19 under section 6214(a),[1] for a total deficiency of $5,088.12. This increase arises from differences between the deficiency notice and the stipulations as to amounts allocable to depreciable property.

After respondent's concession on one 1971 issue, the issues remaining are whether four transfers of property by the husband-petitioner to a corporation are—

(1) Exchanges for stock the gains on which are not to be recognized under section 351(a)[2] (or recognized to the extent of boot, under sec. 351(b)), or

(2) Sales to which section 1239 applies, requiring certain recognized gain to be treated as ordinary income.

This case was submitted on the pleadings and stipulations of facts; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition in this case was filed, petitioners, Hirotoshi Yamamoto (hereinafter referred to as Yamamoto) and Shizuko Yamamoto, husband and wife, were residents of Honolulu, Hawaii.

At all times during the years in issue, Yamamoto owned all of the capital stock of Manoa Finance Co., Inc. (hereinafter referred to as Parent). Parent was in the business of making industrial or commercial loans. At all times during the years in issue, Parent owned all of the capital stock of Manoa Investment Co., Inc. (hereinafter referred to as Subsidiary). Subsidiary was in the business of owning, managing, or holding for rental various real properties located in Honolulu, Hawaii.

During 1970 and 1971, Subsidiary owed a large outstanding debt to Parent. The loans payable account to Parent on Subsidiary's books reflected varying balances during the 2-year period, ranging from a low of $5,048,991.09 (as of June 30, 1970) to a high of $8,539,100.86 (as of August 27, 1971).

From August 1, 1961, to November 1, 1970, Yamamoto owned real property known as 2958–2962 East Manoa Road, Honolulu,

---

[1] Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954, as in effect for the taxable years in issue.

[2] Petitioners reported the gains on their returns as taxable long-term capital gains. On petition, in the prayer for relief, they ask the Court to direct respondent to consider the claim for refund that they filed, presumably because application of sec. 351 would reduce their income tax liabilities. We regard this prayer for relief as a request for the Court to find that petitioners have made overpayments of income tax for the taxable years before the Court (see sec. 6512).

Hawaii (hereinafter referred to as Property 1). From July 2, 1969, to November 1, 1970, Yamamoto owned real property known as 2970–2972 East Manoa Road, Honolulu, Hawaii (hereinafter referred to as Property 2). From July 29, 1966, to June 25, 1971, Yamamoto owned improvements on the land located at 820 Keeaumoku Street, Honolulu, Hawaii (hereinafter referred to as Property 4[3] ). From July 29, 1966, to September 30, 1971, Yamamoto owned improvements on various lots on Keeaumoku Street, Honolulu, Hawaii (hereinafter referred to as Property 5).

During 1970, Subsidiary lent to Yamamoto a total of $559,786.85, as follows:

| | |
|---|---:|
| September 1970 | $8,000.00 |
| November 1970 | 7,045.22 |
| December 1970 | 544,741.63 |
| Total | 559,786.85 |

These amounts were recorded on Subsidiary's books as a note receivable from Yamamoto increasing that account from $831,141.54 (as of December 31, 1969) to $1,390,928.39 (as of December 31, 1970). In December 1971, Subsidiary lent $130,000 to Yamamoto. This amount was also recorded on Subsidiary's books as a note receivable from Yamamoto.

On November 1, 1970, Yamamoto "transferred the burdens and benefits of ownership" of Property 1 and Property 2 to Subsidiary. The transfer price of Property 1 was $133,000. Subsidiary assumed a $19,397.80 mortgage on that property and paid Yamamoto $114,447.38 in cash.[4] The transfer price of Property 2 was $114,500. Subsidiary assumed a $63,386.92 mortgage on that property and paid Yamamoto $51,507.40 in cash.[5]

The transfers of Property 1 and Property 2 were evidenced by

---

[3]Respondent conceded the adjustment he made with respect to another property, described in the stipulations and briefs as Property 3. In order to facilitate reference to the stipulations and briefs, the Court adopts the designations agreed to by the parties as to the remaining properties; i.e., Property 1, Property 2, Property 4, and Property 5.

[4]Of the total cash, $845.18 was for transfer to Subsidiary of a "Customer Trust Fund" connected with the property. It appears that $18,000 of the cash was used by Yamamoto to pay off a second mortgage on the property.

[5]Of the total cash, $394.32 was for transfer to Subsidiary of a "Customer Trust Fund" connected with the property.

documents entitled "Agreement of Sale" dated November 1, 1970, with petitioners as sellers[6] and Subsidiary as buyer. Manoa Realty, a division of Parent, prepared escrow statements in connection with the transfer of the properties showing Yamamoto as "seller" and Subsidiary as "buyer." The transfers were recorded on Yamamoto's individual books and records and on Subsidiary's corporate books and records as sales and purchases of the properties, respectively. Journal entries were made on these books using terms such as "sale" or "purchase." Petitioners reported the transactions on their 1970 Federal joint individual income tax return as sales of property subject to long-term capital gain treatment. Subsidiary recorded on its books the acquisitions from petitioners of Property 1 and Property 2 at their transfer prices and depreciated the depreciable portions of these properties based on allocable amounts of these transfer prices.

The total cash paid by Subsidiary to Yamamoto for the properties, in the amount of $165,954.78 (cash for Property 1 of $114,447.38 plus cash for Property 2 of $51,507.40, see nn. 4 & 5 below) was paid by two checks, one on November 5, 1970, for $20,000 and the other on November 16, 1970, for $145,954.78. These two checks were endorsed by Yamamoto and deposited in his checking account at a bank in Honolulu, Hawaii. During the period February 24, 1970, through November 13, 1970, Yamamoto paid $362,500 to Parent from this account in exchange for Parent stock issued to Yamamoto.

On December 31, 1970, Subsidiary transferred Property 1 and Property 2 to Parent. The transfer price equaled the sum of Subsidiary's December 31, 1970, book values for the two properties. Subsidiary and Parent entered into written agreements entitled "Assignments of Agreement of Sale" with respect to these December 31, 1970, transfers. The records of Subsidiary and Parent reflected the disposition and acquisition of the properties as of December 31, 1970.

On June 25, 1971, Yamamoto transferred "the burdens and benefits of ownership" of Property 4 to Subsidiary. The total transfer price was $95,280.03. This total was comprised of Subsidiary's payment of $41,370.29 to Manoa Realty to reim-

---

[6]The transfer documents refer to both petitioners collectively as "Seller." However, the parties have stipulated as to Yamamoto's ownership and transfer. We assume from this that petitioner-wife had no property interest and played no role in the transfers that we need deal with in this proceeding.

burse it for its advance to Yamamoto to buy out a sublease on Property 4 before the transfer, and Subsidiary's cancellation of debts owed to it by Yamamoto in the amount of $16,055.26 in principal and $37,854.48 in interest. On their 1971 Federal joint individual income tax return, petitioners deducted the $37,854.48 as interest paid. An escrow statement was prepared by Manoa Realty showing Yamamoto as "seller" and Subsidiary as "buyer."

On September 30, 1971, Yamamoto transferred "the burdens and benefits of ownership" of Property 5 to Subsidiary. The total transfer price was $671,549.16. This total was comprised of Subsidiary's assumption of mortgages and notes on the property in the amount of $238,714.62, Subsidiary's release or cancellation of debts owed to it by Yamamoto in the amount of $17,591.51 in interest and $361,243.03 in principal, and Subsidiary's payment to Yamamoto of $54,000 in cash. On their 1971 Federal joint individual income tax return, petitioners deducted the $17,591.51 as interest paid.

The transfers of Properties 4 and 5 were evidenced by a document entitled "Assignment of Lease" between Yamamoto and Subsidiary. The transfers were treated and recorded as sales on the books and records of Yamamoto and Subsidiary, as well as on their respective tax returns.

Subsidiary paid the $54,000 in cash for Property 5 to Yamamoto by check as follows:

| Payment date | Amount |
| --- | --- |
| Oct. 4, 1971 | $20,000 |
| Oct. 5, 1971 | 10,000 |
| Oct. 27, 1971 | 6,000 |
| Oct. 29, 1971 | 15,000 |
| Dec. 14, 1971 | 3,000 |

These checks were endorsed by Yamamoto and deposited in his checking account at a bank in Honolulu, Hawaii. During the period March 15, 1971, through October 9, 1971, Yamamoto paid $272,500 to Parent from this account in exchange for Parent stock issued to Yamamoto. This account is the same one from which Yamamoto paid $362,500 to Parent in 1970 for Parent stock. The account was opened on April 25, 1964. On April 4, 1968, four employees of Parent, three of whom were officers of Parent, were given powers of attorney, as individuals and

without designations as officers of Parent, to sign for this account. The fourth employee replaced one of the other three as an officer of Parent in 1970.

In all, Yamamoto made total contributions to Parent's capital (common stock) account $412,750 in 1970 and $278,500 in 1971 (of which $362,500 in 1970 and $272,500 in 1971 came from the above-described checking account) in exchange for 39,450 shares of Parent stock in 1970 and 29,675 shares of Parent stock in 1971.

The consideration received for the transfer of Properties 1, 2, 4, and 5 from Yamamoto to Subsidiary is summarized in table I, as follows:

TABLE I

| Property | Assumption of mortgages and notes | Release of debt owed Subsidiary by Yamamoto | Payment of Yamamoto's debt to Manoa Realty | Cash | Other[7] | Total |
|---|---|---|---|---|---|---|
| 1 | $19,397.80 | 0 | 0 | $114,447.38 | ($845.18) | $133,000.00 |
| 2 | 63,386.92 | 0 | 0 | 51,507.40 | (394.32) | 114,500.00 |
| 4 | 0 | $53,909.74 | $41,370.29 | 0 | 0 | 95,280.03 |
| 5 | 238,714.62 | 378,834.54 | 0 | 54,000.00 | 0 | 671,549.16 |
| Total | 321,499.34 | 432,744.28 | 41,370.29 | 219,954.78 | (1,239.50) | 1,014,329.19 |

On the respective dates on which Yamamoto transferred Property 4 and Property 5 to Subsidiary, Subsidiary owned the land underlying these properties. On these dates, Subsidiary transferred the respective parcels of land to Parent in transactions which (the parties have stipulated) have no bearing on the issues in the instant case.

Yamamoto did not enter into any written agreements with Subsidiary, Parent, or any other party restricting Yamamoto's use of the proceeds realized by him from his transfer of Property 1, Property 2, or Property 5 to Subsidiary, and Yamamoto did not enter into any written agreement with Parent restricting his use of the proceeds realized by him from his transfer of Property 4 to Subsidiary.

As of December 31, 1976, Property 4 and Property 5 were still shown as assets on the books and records of Subsidiary.

Petitioners maintain that substance should prevail over form in that the transfers of Properties 1, 2, 4, and 5 to Subsidiary in 1970 and 1971, and Yamamoto's purchase of Parent stock in the same period should be viewed as one transaction; namely, an exchange of property for stock, to be governed by section 351. Respondent contends that the form properly reflects the sub-

---

[7] See nn. 4 & 5 supra.

stance, that the transfers of the properties from Yamamoto to Subsidiary were not section 351 transactions, and that section 1239 applies so that any gain on these transfers attributable to depreciable properties is ordinary income.[8] In the alternative, respondent takes the position that, even if section 351 applies, petitioners are taxable on at least $241,534 of "boot" under section 351(b) or alternatively on $23,493.16 under section 357(c). Petitioners respond that section 1239 does not apply, and that there is no "boot" under section 351(b).

We agree with respondent that section 351 does not apply. We agree with petitioners that section 1239 does not apply.

### 1. Nonrecognition of Gain—Section 351

Yamamoto transferred Property 1 and Property 2 to Subsidiary in 1970; in exchange, Subsidiary paid cash to Yamamoto and assumed mortgages on the properties. Yamamoto transferred Property 4 and Property 5 to Subsidiary in 1971; in exchange, Subsidiary released debts owed to it by Yamamoto, paid Yamamoto's debt to a division of Parent, paid cash to Yamamoto, and assumed mortgages and notes on the properties. In form, each of these transactions was a sale or exchange the gain on which was required to be recognized by Yamamoto. Secs. 1001(c) and 1002.[9]

---

[8] Petitioners reported the following amounts of long-term capital gain income on the sale of Properties 1, 2, 4, and 5 on their 1970 and 1971 returns:

| Property No. | Amount |
| --- | --- |
| 1 | $68,592.72 |
| 2 | 5,233.00 |
| 4 | 23,146.34 |
| 5 | 254,346.82 |
| | 351,318.88 |

The parties have stipulated that the following portions of the above-listed gains are attributable to depreciable property:

| Property No. | Amount |
| --- | --- |
| 1 | $24,526.72 |
| 2 | 4,273.00 |
| 4 | 23,146.34 |
| 5 | 254,346.82 |
| | 306,292.88 |

[9] SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.
(c) RECOGNITION OF GAIN OR LOSS.—In the case of a sale or exchange of property, the extent to which the gain or loss determined under this section shall be recognized for purposes of this subtitle shall be determined under section 1002.

Petitioners maintain that section 351(a)[10] (which is in the same subtitle—subtitle A—as sec. 1002) provides otherwise, specifically that it provides that gain is not to be recognized.

*Form.*—On its face, section 351(a) does not apply to the transfers described above, since the properties were not transferred by Yamamoto in exchange for stock or securities. As a result, the application of sections 1001(c) and 1002 to these transfers is not interdicted by section 351 and Yamamoto is required to recognize the gains realized on the transfers. Petitioners acknowledge this is the result if form is to control.

*Substance: Step-transaction.*—Petitioners argue strenuously that we should give effect to substance over form. This principle is promptly agreed to by respondent, who cites *Gregory v. Helvering,* 293 U.S. 465 (1935).[11] Petitioners appear to be invoking the "step-transaction" doctrine, by maintaining that we should treat the following as component parts of single transfers qualifying under section 351: (1) The loans or advances from Subsidiary to Yamamoto, (2) the transfers of properties from Yamamoto to Subsidiary, (3) Subsidiary's payment of cash to and release of indebtedness owed it by Yamamoto, (4) the transfers of Property 1 and Property 2 at book value from Subsidiary to Parent, (5) the cash payments from Yamamoto to Parent, and (6) the issuance by Parent of its stock to Yamamoto. At the end of the series of transactions, petitioners point out, the corporations had the four properties and Yamamoto had the newly issued Parent stock.

Steps are to be treated as part of a single transaction if they are part of an integrated scheme. *Helvering v. Limestone Co.,* 315 U.S. 179, 184–185 (1942). Among various factors considered in determining whether a series of transactions constitute an

---

SEC. 1002. RECOGNITION OF GAIN OR LOSS.

*Except at otherwise provided in this subtitle,* on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized. [Emphasis added.]

The subsequent revisions of these provisions (by secs. 1901(a)(121) and 1901(b)(28)(B)(i) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1784, 1799), do not affect the instant case.

[10]SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation (including, in the case of transfers made on or before June 30, 1967, an investment company) by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

The subsequent amendment of this provision (by sec. 1901(a)(48)(A) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1772) does not affect the instant case.

[11]See comment by L. Hand, J., in *Commissioner v. Sansome,* 60 F.2d 931, 933 (2d Cir. 1932).

integrated scheme to which section 351 applies or whether the transactions should retain their separate identities are (1) the intent of the parties, (2) the mutual interdependence of the steps, (3) the time element, and (4) the ultimate result. *American Bantam Car Co. v. Commissioner*, 11 T.C. 397, 405 (1948), affd. per curiam 177 F.2d 513 (3d Cir. 1949).

Intent to have section 351 apply is not controlling in determining whether section 351 applies (*Six Seam Co. v. United States*, 524 F.2d 347, 355–356 (6th Cir. 1975); *Dennis v. Commissioner*, 57 T.C. 352, 363 (1971), affd. 473 F.2d 274 (5th Cir. 1973); *Nye v. Commissioner*, 50 T.C. 203, 209 (1968); *Gus Russell, Inc. v. Commissioner*, 36 T.C. 965, 969 (1961)). Nevertheless, the intention underlying a questioned transaction is a significant criterion in determining whether the transaction is but a step in a single unified transaction. *Six Seam Co. v. United States*, 524 F.2d at 356; *Vest v. Commissioner*, 57 T.C. 128, 146 (1971), affd. in part and revd. in part on other issues 481 F.2d 238 (5th Cir. 1973); *Nye v. Commissioner*, 50 T.C. at 211–212. We are concerned with actual intent of the parties at the time of the transaction, not constructive, putative, or hypothetical intent. *Vest v. Commissioner, supra* at 146. All the facts and circumstances are to be considered, including the formal acts of the parties in determining whether the substance and form of the transaction were alike as intended. Although a transaction between a sole shareholder and his corporation is not at arm's length and so is subject to close scrutiny, this does not of itself justify disregarding the transaction for tax purposes. E.g., *H. B. Zachry Co. v. Commissioner*, 49 T.C. 73, 81 (1967).

In this case, Yamamoto sat on both sides of the table in each transaction. The books and records of Yamamoto and his corporations all reflected the transactions as being separate rather than interdependent. Apart from any question of presumption of correctness of respondent's determination, we will assume that the acts of the parties and documentation surrounding the transactions reflect the intent of the parties unless we are given some evidence to the contrary. We will not relieve a party from the tax consequences of the form in which he or she appears to have molded a transaction, in the absence of proof that that form does not properly reflect the transaction. *Don E. Williams Co. v. Commissioner*, 429 U.S. 569, 579–580 (1977); *Commissioner v. Nat. Alfalfa Dehydrating*, 417 U.S. 134, 148–149

(1974). Petitioners have not shown that either Yamamoto or those who kept his books and records and the books and records of the corporations misunderstood or misrepresented the nature of the transactions as they intended them. That they may have misunderstood the tax consequences is a separate matter. *Gus Russell, Inc. v. Commissioner, supra* at 968.

With respect to the factor of mutual interdependence, courts have looked at whether the steps were so substantively interdependent that the legal relations created by one transaction would have been fruitless without the completion of the other transactions. E.g., *H. B. Zachry Co. v. Commissioner, supra* at 82; *American Bantam Car Co. v. Commissioner, supra* at 405–407. There is no indication in the record that Yamamoto was bound, formally or informally, to contribute the sales proceeds to Parent (*Vest v. Commissioner, supra* at 145), nor any evidence that the steps were inseparably related and part of a preconceived plan. In fact, the parties stipulated the absence of such written arrangements. Petitioners have presented no evidence that the transfers of property by Yamamoto would not have been done without the transfers of stock by Parent. We are not given a convincing reason to believe that the transfers of properties to Subsidiary were dependent on completion of the stock transfers. Certainly the property transfers and the stock transfers had separate legal significance and the record is consistent with their having separate business significance. Compare *Vest v. Commissioner, supra* at 145, with *Nye v. Commissioner, supra* at 212. Petitioners also have presented no evidence that Subsidiary was obligated to transfer the properties to Parent; in fact, Property 4 and Property 5 remained properties of Subsidiary at least through December 31, 1976. The suspicion that there may have been a prearranged plan is not sufficient.

All the transactions in question occurred during 1970 and 1971. However, that factor is not by itself controlling. *H. B. Zachry Co. v. Commissioner, supra* at 82–83. The mere fact that steps occur close in time does not mean they are interrelated. *Vest v. Commissioner, supra* at 146; *Kind v. Commissioner*, 54 T.C. 600, 607–608 (1970). Besides, we do not see a convincing pattern emerging from the transaction dates. Transfers of money were made from Subsidiary to Yamamoto in September, November, and December of 1970 and then not until December

of 1971. Transfers of cash for stock were spread out over the period of February of 1970 to October of 1971. The transfers of properties from Yamamoto to Subsidiary occurred on November 1, 1970, June 25, 1971, and September 30, 1971. Property 1 and Property 2 were transferred from Subsidiary to Parent on December 31, 1970. Property 4 and Property 5 remained properties of Subsidiary at least through December 31, 1976.

Petitioners maintain that Subsidiary acted as Parent's agent in accepting the properties from Yamamoto. In support of this, petitioners note that Subsidiary was heavily indebted to Parent, that Property 1 and Property 2 were transferred from Subsidiary to Parent on December 31, 1970, and that the land underlying Property 4 and Property 5 was transferred by Subsidiary to Parent on June 25, 1971, and September 30, 1971, respectively.

The fact that Subsidiary was heavily indebted to Parent does not mean that acts by Subsidiary were in reality acts of Parent. We will not so easily disregard the distinct identities of active business corporations. See *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943). Subsidiary was engaged in the business of owning, managing, or holding for rental various real properties located in Honolulu, Hawaii. On the basis of the record before us, it is more reasonable to conclude that Subsidiary was acting on its own behalf in the acquisition of real property from Yamamoto, than it is to conclude that Subsidiary was Parent's agent. Besides, petitioners' arguments conflict with the following elements of the record: (1) All the documentation showed Subsidiary as the purchaser; (2) Subsidiary recorded the properties on its books and took depreciation deductions attributable to them; (3) Subsidiary still held two of the properties as of December 31, 1976; and (4) the parties have stipulated that the transfers of the land underlying Property 4 and Property 5 have "no bearing on the issues in this case." Even if we were convinced that Subsidiary was Parent's agent in acquisition of the properties, petitioners would still need to convince us that the transfer by Yamamoto to Parent was a section 351 transfer and not a sale. See *Shannon v. Commissioner*, 29 T.C. 702, 717 (1958).

Petitioners also maintain that Yamamoto effectively did not receive any cash from Subsidiary. In support of this, they contend that the cash paid by Subsidiary was deposited in an

account which could be drawn upon, not only by Yamamoto but also by several others who were officers of Parent. They point out that funds from this account furnished the bulk of the cash transferred by Yamamoto to Parent in exchange for Parent's stock. They argue that these facts support their contention that the account was really an account of Parent rather than Yamamoto's private, personal account so that Yamamoto did not receive any cash for his own use but instead received only stock in Parent.

We are not told whether the account was commonly used for Parent's purposes rather than Yamamoto's purposes. Despite petitioners' contentions on brief, there is no evidence in the record (see Rule 143(b),[12] Tax Court Rules of Practice and Procedure) that the loans or advances made by Subsidiary to Yamamoto were deposited in the checking account. Furthermore, even if there were, we are not told what happened to the account after 1971 since more money was transferred to the account from Subsidiary than was transferred from the account to Parent.[13] Petitioners' analysis of the status of the account conflicts with Yamamoto's joining in reporting the transactions as sales on petitioners' income tax returns; it conflicts with Yamamoto's causing his books and records to treat the property transfers, the money transfers, and the stock transactions as separate transactions; it conflicts with Yamamoto's recording the transactions on his books and records as sales of the properties and as loans. We note that, since Yamamoto had complete control of the situation, he could have arranged the transfers directly, and as an integrated package, merely by transferring the property directly to Parent and by having the cash moved directly from Subsidiary to Parent.

As to the alleged failure of consideration, petitioners appear

---

[12]RULE 143. EVIDENCE

(b) Ex Parte Statements: Ex parte affidavits, statements in briefs, and unadmitted allegations in pleadings do not constitute evidence. As to allegations in pleadings not denied, see Rules 36(c), 37(c) and (d).

[13]Cash of $635,000 was transferred to Parent from the account for stock whereas petitioners claim that cash was transferred to the account by Subsidiary in the following amounts:

|  |  |
|---|---|
| 1970 loan | $559,787 |
| 1971 loan | 130,000 |
| Cash on Property 1 and 2 | 165,955 |
| Cash on Property 4 and 5 | 54,000 |
|  | 909,742 |

to argue as follows: (1) The consideration for the properties was Parent's transfer of stock to Yamamoto, (2) the stock was not transferred by Parent "under the order or control of * * * [Subsidiary, since Subsidiary] * * * is acting under the direction and control of * * * [Parent]," (3) therefore Subsidiary did not furnish consideration for the properties and so the properties could not have been "sold" by Yamamoto to Subsidiary. That argument assumes the very thing petitioners are trying to prove, that the Parent stock was the consideration for the properties. The record discloses that, Subsidiary gave Yamamoto cash, assumed mortgages and notes, released Yamamoto's debt to Subsidiary and paid Yamamoto's debt to Manoa Realty. (See table I *supra*.) We conclude that this constituted consideration to support a sale of the properties by Yamamoto to Subsidiary, sufficient to take the transaction out of section 351.

Accordingly, we conclude that no basis appears in this record to apply the step-transaction doctrine; petitioners have wholly failed to persuade us that Yamamoto's books and records, as well as those of the corporations, were in complete conflict with the true intention of the parties to the transactions or that the transactions were mutually interdependent. Even if we were to conclude that the transactions were mutually interdependent, it would not follow from that alone that these transactions were section 351 exchanges.

On this issue, we hold for respondent.

Because of our determination that the transfers of the properties were sales, and not section 351 exchanges, we do not reach the question of whether, if section 351 applied, any gain should be taxed and, if so, how it should be taxed.[14]

## 2. *Characterization of Gain—Section 1239*

Respondent maintains that, for purposes of section 1239, "in the narrow factual situation of a sale by a shareholder of depreciable property to the wholly-owned subsidiary corporation of his wholly-owned corporation, the stock of the subsidiary should be viewed as constructively owned by the owner of the parent corporation." Petitioners insist that section 1239 does not apply.

---

[14]See *Alderman v. Commissioner*, 55 T.C. 662 (1971), applying sec. 1239 to a sec. 351 transfer.

We agree with petitioners that section 1239 does not apply.

Yamamoto transferred Property 1 and Property 2 to Subsidiary on November 1, 1970. On December 31, 1970, Subsidiary transferred these two properties to Parent. Yamamoto transferred Property 4 and Property 5 to Subsidiary on June 25, 1971, and September 30, 1971, respectively.

In our analysis of the section 351 issue, we concluded that Yamamoto's transfers of the four properties to Subsidiary constituted sales. The parties have stipulated the extent to which the gains on the transfers are attributable to depreciable property (see n. 8 *supra*). The question we now address is whether section 1239[15] as in effect during the years before the Court applies to these sales.

Yamamoto's sales were to Subsidiary. These sales are the transactions that respondent asserts are taxable and to which respondent asks us to apply section 1239. The parties agree that Parent owns all the shares of Subsidiary. Consequently, on its face section 1239 does not apply to the sales because the sales were between an individual and a corporation as to which "such individual, his spouse, and his minor children and minor grandchildren" "owned" less than 80 percent of the outstanding stock, i.e., in the aggregate they owned none of the outstanding stock.

Respondent asserts that the "sole shareholder of a wholly-owned corporation ('the parent') and a corporation wholly owned by the parent are related persons within the meaning of I.R.C.

---

[15]SEC. 1239. GAIN FROM SALE OF CERTAIN PROPERTY BETWEEN SPOUSES OR BETWEEN AN INDIVIDUAL AND A CONTROLLED CORPORATION.

(a) TREATMENT OF GAIN AS ORDINARY INCOME.—In the case of a sale or exchange, directly or indirectly, of property described in subsection (b)—

(1) between a husband and wife; or

(2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren;

any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231.

(b) SECTION APPLICABLE ONLY TO SALES OR EXCHANGES OF DEPRECIABLE PROPERTY.—This section shall apply only in the case of a sale or exchange by a transferor of property which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 167.

The subsequent revision of this section by sec. 2129(a) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1922, is discussed *infra*. The subsequent amendment of this section by sec. 701(v)(1) of the Revenue Act of 1978, Pub. L. 95–600, 92 Stat. 2920, does not affect the instant case.

§1239, as in effect for 1970 and 1971." The term "related persons" does not appear in section 1239 as so in effect.[16] We gather from this that respondent would have us attribute Parent's ownership of Subsidiary to Yamamoto, either because of some set of attribution rules, or because of Yamamoto's practical control over Parent (and, therefore, Subsidiary), or because of Yamamoto's beneficial ownership of Subsidiary.

We have considered this general issue several times in the past. *Miller v. Commissioner*, 510 F.2d 230 (9th Cir. 1975), affg. a Memorandum Opinion of this Court;[17] *Trotz v. Commissioner*, 361 F.2d 927 (10th Cir. 1966), revg. 43 T.C. 127 (1964); *Mitchell v. Commissioner*, 300 F.2d 533 (4th Cir. 1962), revg. 35 T.C. 550 (1960); *10–42 Corp. v. Commissioner*, 55 T.C. 593 (1971). See *United States v. Rothenberg*, 350 F.2d 319 (10th Cir. 1965). After analyzing the legislative history of the enactment[18] of the predecessor of section 1239, "we reluctantly interpreted the word 'owned' in sec. 1239 to include beneficial ownership only because of a long-standing regulation." (*10–42 Corp. v. Commissioner*, 55 T.C. at 598 n. 4.) We held that ownership by a trust for the benefit of an individual was to be treated as ownership by the individual (*Mitchell v. Commissioner, supra*), and also that "practical control," including an individual's option to purchase stock owned by another, was to be treated as ownership by the individual. (*Trotz v. Commissioner, supra*.) However, the Court of Appeals for the Fourth Circuit concluded that the statute did not admit of constructive ownership through a trust (reversing us in *Mitchell v. Commissioner*), and the Court of Appeals for the Tenth Circuit not only agreed with the Court of Appeals for the Fourth Circuit as to trusts (*United States v. Rothenberg, supra*), but also concluded that the statute did not admit of constructive ownership because of "practical control" (reversing us in *Trotz v. Commissioner*)—at least where the questioned arrangement was not a sham.

We held that the statute did not permit the use of constructive ownership to attribute acts of a corporation to its controlling shareholder and so section 1239 did not apply to transactions between brother-sister corporations. *10–42 Corp. v. Commission-*

---

[16]The term "related persons" is, however, a defined term in sec. 1239 as in effect after the date of the enactment of the Tax Reform Act of 1976, described *infra*.

[17]T.C. Memo. 1973–68.

[18]Sec. 328, Revenue Act of 1951, Pub. L. 82–183, 65 Stat. 504.

*er, supra.* In this, we were upheld by the Court of Appeals for the Ninth Circuit. *Miller v. Commissioner, supra.*

In section 2129 of the Tax Reform Act of 1976 (Pub. L. 94–455, 90 Stat. 1922), the Congress amended section 1239 to make the constructive ownership rules of section 318 applicable in determining stock ownership under section 1239 and also to have the section apply to sales between brother-sister corporations.[19] The provision was added to the bill by the Senate Committee on Finance, which gave, in part, as a reason for change the following:

> No rules of constructive ownership are provided in section 1239 for purposes of determining the ownership of stock under that provision. As a result, a taxpayer may be able to structure a transaction to circumvent the applicability of the section. For example, a taxpayer desiring to sell depreciable property to a corporation which he wholly owns *may be able to avoid section 1239 by (prior to the sale) contributing his stock in the corporation to a holding company* or by transferring 20 percent of his stock to a trust for the benefit of members of his family. Although it can be argued that the taxpayer continues to own the stock "indirectly" and section 1239 therefore should come into play, as explained above, the courts have been reluctant to give a broad interpretation to the term "indirectly." [Emphasis added.]

S. Rept. 94–938 (Part 2), pp. 29–30, 1976–3 C.B. (Vol. 3) 643, 671–672. The Conference Committee agreed to (and the Congress enacted) the Finance Committee's amendment. S. Rept. 94–1236, pp. 526–527, 1976–3 C.B. (Vol. 3) 807, 930–931. Joint Comm. on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, 651–654 (1976), 1976–3 C.B. (Vol. 2) 1, 663–666. The application of the constructive ownership rules was made effective for sales or exchanges made after October 4, 1976, except sales or exchanges made pursuant to a binding

---

[19]SEC. 1239. GAIN FROM SALE OF DEPRECIABLE PROPERTY BETWEEN CERTAIN RELATED TAXPAYERS.

(a) TREATMENT OF GAIN AS ORDINARY INCOME.—In the case of a sale or exchange of property, directly or indirectly, between related persons, any gain recognized to the transferor shall be treated as ordinary income if such property is, in the hands of the transferee, subject to the allowance for depreciation provided in section 167.

(b) RELATED PERSONS.—For purposes of subsection (a), the term "related persons" means—

(1) a husband and wife,

(2) an individual and a corporation 80 percent or more in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual, or

(3) two or more corporations 80 percent or more in value of the outstanding stock of each of which is owned, directly or indirectly, by or for the same individual.

(c) CONSTRUCTIVE OWNERSHIP OF STOCK.—Section 318 shall apply in determining the ownership of stock for purposes of this section, except that sections 318(a)(2)(C) and 318 (a)(3)(C) shall be applied without regard to the 50-percent limitation contained therein.

contract entered into before October 4, 1976 (sec. 2129(b), 90 Stat. 1922).

It appears to be clear that neither Parent nor Subsidiary was a sham, that each of the corporations conducted business, and that each of the corporations was the owner of the properties described at the times indicated in the foregoing portions of this opinion. Given the reversals of our initial opinions, the uncertain lessons of the legislative history of section 328 of the Revenue Act of 1951, Pub. L. 82–183, 65 stat. 504, and the actions of the Congress in settling these matters from 1976 onward, we conclude that proper administration of the tax laws would not be enhanced by our holding that section 1239 applies to the transfers here in issue.

To the extent that our opinions in *Mitchell v. Commissioner, supra,* and *Trotz v. Commissioner, supra,* may be regarded as inconsistent with our holding herein, we will no longer follow these opinions.

Respondent does not contend that (and we do not decide whether) the transfers of any of the properties amounted to a sale or exchange, "directly or indirectly" between Yamamoto and Parent. See *Miller v. Commissioner,* 510 F.2d at 233–234.

On the section 1239 issue, we hold for petitioners.

To reflect the concessions made by the parties, the conclusions reached herein, and the effect of these conclusions on asserted liabilities for minimum tax,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

TANNENWALD, *J.,* concurring: I am in complete agreement with the result reached by the majority and with much of its analysis. I append these remarks in order to emphasize what I fear may be a misapplication of some of that analysis in future cases. Section 351 specifically provides for nonrecognition of gain or loss "if property is transferred to *a corporation* by one or more persons solely in exchange for stock or securities in *such corporation.*" (Emphasis added.) See *Marcher v. Commissioner,* 32 B.T.A. 76, 79 (1935). Compare *Helvering v. Bashford,* 302 U.S. 454 (1938), and *Groman v. Commissioner,* 302 U.S. 82 (1937). In

my opinion, except to the extent that the subsidiary could be found to be a mere conduit or the agent either of petitioner to transfer the property to the parent or of the parent to receive the property from the petitioner (and I agree that such a situation did not exist in this case), section 351 simply does not apply. Petitioner did not get stock of the corporation, i.e., the subsidiary, to which the property was transferred. Under these circumstances, I think that much of the discussion of an integrated transaction or mutual interdependence of the steps taken versus a separate transaction or substantively indepen- dent steps taken is beside the point.

Perhaps my concern with the analysis in the majority opinion is rooted in semantics and merely mirrors a not infrequent problem of choice of words for a judicial opinion. Indeed, I recognize that the majority opinion warns that a finding of mutual interdependence would not necessarily determine the section 351 issue (p. 958 *supra*.). I have nevertheless felt compelled out of an abundance of caution to articulate a specific statutory foundation for that warning.

DRENNEN, STERRETT, and NIMS, *JJ.*, agree with this concurring opinion.